Victor J. CHMIELESKI et al., Plaintiffs,

v.

CITY PRODUCTS CORPORATION, (Missouri Registered Agent, C. T. Corporation System), et al., Defendants.

No. 19–879–3.

United States District Court, W. D. Missouri, W. D.

April 14, 1976.

John T. Martin and John C. Monica (Shook, Hardy, Ottman, Mitchell & Bacon), Kansas City, Mo., for plaintiff.

Donald W. Giffin (Spencer, Fane, Britt & Browne), Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER SUSTAINING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO MAINTAIN THIS ACTION AS A CLASS ACTION

ELMO B. HUNTER, District Judge.

This matter is presently before the Court upon the motion of plaintiffs in this cause to proceed with their claims as asserted in

their first amended complaint on behalf of themselves and other persons or entities similarly situated pursuant to Rule 23, F.R. Civ.P. This action was commenced on November 16, 1971, by plaintiffs Victor J. Chmieleski and Geraldine Chmieleski upon the filing of their complaint alleging violations of the Federal Antitrust Laws and seeking damages in the amount of $300,-000.00 and injunctive relief. Subsequently, on April 7, 1972, an amended complaint was filed by the original plaintiffs and 10 additional plaintiffs representing 11 Ben Franklin franchised stores.[1] That first amended pleading sought an order determining this action to be maintained as a class action under Rule 23(b)(1), (2), and (3) F.R.Civ.P. Since the Court's Order of April 5, 1972, this action has been designated as "Complex" and proceedings have been governed by the *Manual for Complex and Multidistrict Litigation* (1970 ed. with amendments) and the *Manual For Complex Litigation* (1973 ed. with amendments) as applied by the orders of the Court.

Following what can only be termed protracted prehearing discovery and procedures, plaintiffs' motion to proceed with this action as a class action was called for full evidentiary hearing on July 21, 1975. That hearing continued with interruptions until completion on September 23, 1975. The filing of proposed findings and conclusions and responses thereto was completed on November 17, 1975, exactly four years after the commencement of this action. The Court deems plaintiffs' Rule 23 motion to be now fully submitted.[2]

1. For the purposes of this memorandum, a husband and wife who are franchised to operate a Ben Franklin store are treated as a single plaintiff.

2. The above-styled cause was transferred to the undersigned judge on October 29, 1974. Since that transfer, the undersigned has attempted to follow the practice of the judge to whom the action was previously assigned by continuing the processing of this action under the procedures outlined in the *Manual For Complex Litigation* (1973 ed.), and continuing to attempt to expedite the processing of this obviously intricate civil action. It is, however, apparent to the undersigned that the attempts to process

## I. PLAINTIFFS' CLASS ACTION CLAIMS

By their *Amended Statement Concerning Class Action Issues,* filed on April 8, 1975, and their *Documentation of Narrative and Affirmative Statements Using the Term "Period in Suit"*, filed on November 14, 1975, plaintiffs have attempted to specifically define the class of persons and entities they seek to represent and the claims they desire to present on behalf of that overall class.

The proposed class is defined as:

"All persons who own or have owned four (4) or fewer Ben Franklin variety stores at the same time and who have entered into the "Ben Franklin Franchise Agreement" with defendant City Products whereby they did and/or are doing business under its trademark "Ben Franklin" in the period in suit."

The "period in suit" as contained in plaintiffs' definition of the class is as follows:

(1) With regard to all substantive claims, except the claim concerning confidential rebates from suppliers, the period in suit is during the period commencing on April 7, 1968 and ending on April 7, 1972.

(2) With regard to plaintiffs' substantive claim concerning confidential rebates from suppliers, the period in suit is during the period January 1, 1960, until April 7, 1972.

Generally, as stated in plaintiffs' *Amended Statement Concerning Class Action Issues,* filed on April 8, 1975, the substantive

this litigation to a reasonably timely end have been somewhat unsuccessful, as the action has presently been pending in excess of four years and the parties have not yet engaged in discovery on the merits of their claims and defenses. The undersigned does not deem this excessive amount of time consumed in the processing of this case to be due to either actions or inaction of counsel or the method of pretrial processing employed. Rather, it is deemed due to the Frankenstein which is created when parties seek to proceed in one action with a number of complex and unrelated antitrust claims on behalf of a relatively large class of persons pursuant to Rule 23.

claims of illegal practices with which plaintiffs desire to proceed on behalf of themselves and the proposed class of plaintiffs are as follows:

 A. Alleged Illegal Tying Arrangements

 (1) Alleged Tying of Accounting Services

 (2) Alleged Tying of Store Premises

 (3) Alleged Tying of Fixtures and Signs

 (4) Alleged Tying of Retail Merchandise

 B. Alleged Conspiracy and Confidential Rebates from Supplier

 C. Alleged Illegal Price Discrimination

 D. Alleged Illegal Exclusive Dealing Requirements

 E. Alleged Illegal Encroachment by Company Owned Stores

■ It is now firmly established that plaintiffs in a class action brought under Rule 23 are not to be required to establish the merits of their substantive claims or a likelihood of prevailing on those claims in order to maintain the claims as a class action. *Eisen v. Carlisle and Jacqueline,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, because the requirements of Rule 23, F.R.Civ.P. involve determinations of commonality and typicality of claims, it is necessary to an appropriate determination of a Rule 23 motion that the Court analyze the substantive claims and defenses of the parties, the essential elements necessary to establish those claims, and the elements involved in the defenses which are likely to be asserted. Therefore, the initial portion of this Opinion will set forth the substantive claims which the plaintiffs desire to present on behalf of themselves and the proposed potential class members.

### A. *Alleged Illegal Tying Arrangements*

Plaintiffs, present and former Ben Franklin franchisees, desire to proceed as a class action with four separate claims of illegal tying arrangements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by the defendant City Products Company. In each of those claims, the alleged "tying" item is the "Ben Franklin" trademark, service mark, and franchise agreement which is "marketed" by the Ben Franklin Division of the defendant City Products Corporation. It is plaintiffs' contention that the "Ben Franklin" trademark, service mark, and franchise agreement could be obtained by plaintiffs and potential class members only if they subscribed to an accounting service offered by City Products Corporation, subleased their retail store premises from City Products Corporation, purchased retail store fixtures from City Products Corporation, purchased a permanent outside sign from a source connected to City Products Corporation or from City Products Corporation, purchased the merchandise necessary to commence a retail business from City Products Corporation, and purchased the bulk of their retail merchandise from City Products Corporation. Further alleging that the "tying" item possesses sufficient economic power to appreciably restrain competition in the "tied" items, that the "tying" item and the alleged "tied" items are all separate and distinct, and that there is a not insubstantial amount of interstate commerce affected by each of the arrangements, plaintiffs claim that the tying arrangements constitute a *per se* violation of Section 1 of the Sherman Act. By way of relief, plaintiffs seek an injunction prohibiting the alleged illegal practices as to themselves and the potential class of plaintiffs, and they seek treble damages suffered during the "period in suit" by themselves and each potential class member. Generally, the amount of damages claimed is the difference between the price paid for the alleged tied item and the amount that same item could have been obtained by the plaintiff or potential class member on the open market.

### B. *Alleged Confidential Rebates*

The second category of claim with which plaintiffs desire to proceed as a class claim is based on an alleged conspiracy between City Products Corporation and suppliers of retail merchandise to prevent plaintiffs and potential class members from purchasing merchandise for retail sale from suppliers directly and to prevent direct billing of

plaintiffs and potential class members by suppliers of retail merchandise. This conspiracy claim, which relates to plaintiffs' claim that retail merchandise is an item tied to the "Ben Franklin" trademark and franchise agreement, includes allegations that City Products utilizes the extension of credit to potential class members and plaintiffs as a device to compel the purchase of merchandise manufactured or distributed by its "authorized sources", that City Products received confidential rebates from the authorized sources based on the amount of purchases, and that City Products Corporation utilizes the accounting service allegedly tied to the franchise and trademark granted to plaintiffs and potential class members to monitor the franchisees' purchases of merchandise from unauthorized or outside sources. Plaintiffs seek on behalf of themselves and the entire potential class of plaintiffs an order enjoining the alleged conspiracy. In addition, they allege a breach of fiduciary duty and a violation of Section 2(c) of the Robinson-Patman Act and seek an award of damages on behalf of each plaintiff and class member stated to be a pro rata distribution of confidential rebates and allowances received by City Products Corporation from suppliers from January 1, 1960, until April 7, 1972. Fraudulent concealment is alleged to have occurred with regard to this claim, thereby making the statute of limitations inapplicable.

### C. Alleged Illegal Price Discrimination

The third broad substantive claim of violation of the federal antitrust laws which plaintiffs desire to present on a class wide basis initially involves the factual allegation that City Products Corporation owns retail stores, has wholly owned subsidiaries which own or have subsidiaries which own retail stores, and franchises "chain stores" which are in competition with franchised stores owned by plaintiffs and potential class members. In this alleged factual context, plaintiffs allege that "chain-stores" and "company owned stores" are given lower prices on supplied merchandise or fixture items than "competing" stores owned by

plaintiffs and potential class members. It is contended that this alleged price discrimination is in violation of Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), Section 1 of the Sherman Act, 15 U.S.C. § 1, and the terms of the franchise agreements which exist between defendant City Products Corporation and each of the plaintiffs and potential class members.

Plaintiffs request an injunction prohibiting the alleged price discrimination in the future, and they seek on behalf of themselves and the potential class members an award of damages which is stated to be the amount the franchisees have been "overcharged" for merchandise supplied by defendant City Products Corporation.

### D. Alleged Illegal Exclusive Dealing Requirements

The fourth broad category of antitrust claim presented by plaintiffs and desired by them to be maintained on behalf of the defined class relates to plaintiffs' factual allegation that City Products Corporation requires as a condition to the plaintiffs' and potential class members' continuation of doing business under the "Ben Franklin" trademark and franchise agreement that they not engage in the retail "variety store" business except under the "Ben Franklin" trademark and franchise. With regard to this claim, damages are not sought. Rather, plaintiffs seek an injunction prohibiting the termination of a plaintiff's or class member's franchise on the basis of his noncompliance with the alleged exclusive dealing requirement, and prohibiting the imposition of the alleged exclusive dealing requirement on plaintiffs or potential class members.

### E. Alleged Illegal Encroachment by "Company Owned Stores"

The final broad category of claims which plaintiffs seek to present and maintain as a class action claim for injunctive relief relates to their allegation that there exists a conspiracy to monopolize in violation of Sections 1 and 2 of the Sherman Act between

City Products Corporation, the Ben Franklin Division of City Products Corporation, and the T. G. & Y. Stores Company to eliminate "small" stores operating under a "Ben Franklin" trademark and franchise agreement and to replace them with "company-owned" stores. Specifically, plaintiffs allege that City Products Corporation uses stores operating under the "Ben Franklin" trademark and franchise agreement to develop local markets and thereafter enters the same market with a "company owned" store or store owned by its wholly-owned subsidiary to drive the franchisee out of business and appropriate the franchisee's trade territory. Additionally, plaintiffs allege an attempt to monopolize the "variety stores" industry in violation of Section 2 of the Sherman Act by City Products Corporation. The injunctive relief sought by plaintiffs on behalf of themselves and the potential class of plaintiffs includes an order compelling the defendant City Products Corporation to divest itself of its subsidiary T. G. & Y. Stores Company.

Having outlined the basic claimed violations of the federal antitrust laws which plaintiffs desire to maintain on behalf of the defined class under Rule 23, F.R.Civ.P., the Court will next address itself to the factual background which underlies those claims.[3]

## II. BACKGROUND OF THE LITIGATION

In connection with plaintiffs' motion to maintain the claims previously outlined on

behalf of themselves and other persons or entities similarly situated and the defendants' vigorous opposition to that motion, the parties have adduced and the Court has received a voluminous amount of evidence.[4] The evidence has been offered and received solely as it may pertain to the issues raised by the Rule 23 motion, although much of the evidence might be relevant to plaintiffs' and potential class members' substantive claims or the defenses thereto. The factual findings made by the Court in its determination of the Rule 23 issues are for that limited purpose only and are not binding on the parties or potential class members in connection with their substantive claims or defenses. The Court does not in its present Rule 23 determination intend to indicate any opinion with regard to the substantive claims or defenses of the parties or potential parties.[5]

### A. Organization and Activities of City Products Corporation and its Subsidiaries

The named defendants in plaintiffs' class action complaint are City Products Corporation (City Products), T. G. & Y. Stores Company (T. G. & Y.) and T. G. & Y. Stores Company of Missouri. City Products is presently a wholly-owned subsidiary of Household Finance Corporation, its capital stock having been acquired by Household Finance in 1965. Prior to its acquisition by Household Finance, City Products had on February 11, 1960, acquired the assets of

---

**3.** The basic claims sought to be maintained as a class action set forth by the Court have been obtained primarily from plaintiffs' *Amended Statement Concerning Class Action Issues,* which the Court has deemed to be a particularization of the class action claims set forth in plaintiffs' first amended complaint filed on April 7, 1972. The Court has deemed abandoned the class action claims not set forth in plaintiffs' *Amended Statement, supra,* insofar as plaintiffs seek to present claims on behalf of persons other than themselves.

**4.** Plaintiffs' documentary proof on the Rule 23 issues totals approximately 2,100 pages. Defendants' documentary proof totals in excess of 2,000 pages. There are 8 volumes of transcripts of the evidentiary hearing on the Rule

23 issues, which hearing was by the extensive prehearing procedures employed held to a bare minimum of oral testimony. The parties have submitted proposed findings and conclusions on the Rule 23 issues, each of which is approximately 300 pages in length.

**5.** The findings of the Court reflect the Court's rulings on the evidentiary objections asserted at the hearing and taken under advisement by the Court at close of the evidentiary hearing. The Court has relied upon the contents of documentary exhibits and has disregarded the parties' evidence which purports to establish the contents of the documents unless otherwise indicated.

Butler Brothers Corporation. Included in those assets was the "Ben Franklin" franchise operation formerly operated by Butler Brothers and all of the capital stock of T. G. & Y. Stores Company, and Scott-Burr, Inc. Since the 1965 acquisition of City Products by Household Finance, City Products has conducted the "merchandising" activity of Household Finance Corporation.[6]

The "merchandising" activities of City Products are carried out through its various divisions and subsidiary corporations. The divisions of the corporation include: American Furniture Stores, Barker Brothers, John A. Colby & Sons, Dryer's Furniture Co., Gold's Furniture and Appliances, and Miller Desk, all engaged in retail furnishings; Butler Brothers Department Stores, retail merchandise stores; Refrigeration and Cold Storage Division, refrigeration services and ice; and the Ben Franklin Division. The subsidiaries of City Products Corporation include: Coast to Coast Stores, franchises retail hard goods stores; Ball Ice Machine Company, manufacturer and seller of ice machines; Barker Brothers Commercial Division, Inc., institutional interior design and furniture; Bishop & Malco, Inc., department store; City Workers Service, Inc., former employer of seasonal workers in ice and cold storage plants; Empire State Ice Co., Ltd. (Canada) manufacture and sale of ice; The Hearst-Allen Co., formerly jobber; Huffman-Koos Co., retail furniture stores; SHM, Inc., operates a "Ben Franklin Store" in Michigan; Vons Grocery Co., retail grocery supermarkets; White Stores, Inc., franchises and operates hard goods stores; T. G. & Y. Stores Company, owns and operates retail T. G. & Y. stores, and Scott stores. City Products reported net sales in 1971 was in excess of $1.3 billion with net income in excess of $29 million.

During the "period in suit," April 7, 1968, to April 7, 1972, both the Ben Franklin Division of City Products and the subsidiary, T. G. & Y. Stores Company, were a part of the merchandising operation of City Products Corporation referred to as the "variety stores operation". The specific activities of each of these operations is as follows:

### 1. *T. G. & Y. Stores Company*

The T. G. & Y. Stores Company owns and operates retail stores throughout the United States. In 1972, it owned and operated either directly or through its wholly owned subsidiaries approximately 820 retail stores in the states of Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Virginia. Of the stores owned and operated by T. G. & Y., approximately 120 stores are referred to and do business as "Scott" stores.[7] With one minor exception, T. G. & Y. operates only retail stores which are owned by it or its wholly owned subsidiaries. It does not engage in the franchising of stores or the distribution of merchandise to independently owned stores.

The T. G. & Y. operation is somewhat independent of City Products Corporation and its other subsidiaries and divisions. T. G. & Y. has its own buying and merchandising organization, its own sales promotion programs, its own stock lists and stock numbers, its own accounting system, and a separate administrative and personnel system. The T. G. & Y. merchandising operation is divided into nine geographic divi-

---

**6.** Household Finance Corporation has since 1965 been engaged in the four major activities designated by it as "finance", "merchandising", "manufacturing", and "rental and leasing".

**7.** Scott-Burr, Inc., the original owner of Scott stores, was acquired from Butler Brothers by City Products in 1960. Soon thereafter Scott-Burr was dissolved, and Scott stores were owned and operated by City Products and serviced by the Ben Franklin Division. In October, 1969, the Scott stores were "sold" to T. G. & Y. At that time there were 120 Scott stores, some of which were later renamed "T. G. & Y." Of those 120 stores, approximately 50% are still being serviced by the Ben Franklin Division.

sions, each of which is headed by a division vice president. T. G. & Y. warehouses are maintained in Shreveport, Louisiana; Lubbock, Texas; LaMirada, California; Montgomery, Alabama; Kansas City, Kansas; Edmond, Oklahoma and Oklahoma City, Oklahoma. The company's business headquarters and central offices are located in Oklahoma City, Oklahoma.

## 2. *The Ben Franklin Division*

The primary focus of the evidence presented in this matter is on the Ben Franklin Division of City Products Corporation. This unincorporated sub-entity of City Products, which was included in the package acquired by City Products from Butler Brothers in 1960, had been operated by Butler Brothers since about 1920. The City Products acquisition did not result in any major changes of operation or management in the organization. The activities of the Ben Franklin Division of City Products Corporation are numerous and varied, and it is those activities which form the primary basis of the majority of the substantive claims asserted by plaintiffs herein on behalf of themselves and the previously defined class. The general franchising activities of the Ben Franklin Division and the services and items which it provides to franchisees are as follows:

### a. *Franchise Operations*

During the period 1960 to the present date, the "Ben Franklin" franchise operation of City Products was carried out by the Ben Franklin Division. The operation of the Ben Franklin Division includes the franchising of independently owned "Ben Franklin" retail stores throughout the United States, the selling and distributing of merchandise to those stores, providing a system for store management, and providing various other services to its franchisees. As of September 1, 1972, there were approximately 1,860 franchised stores in the Ben Franklin operation, with all but approximately 158 doing business under the "Ben Franklin" name.

Since 1960, the Ben Franklin Division has centrally directed its franchise operations from its headquarters and conducted operations through seven or eight regional offices and distribution centers. Each region has a manager and staff who plan and develop and provide operational assistance to franchised stores in their region. The managers of the regions are also vice presidents of the Ben Franklin Division of City Products. Those regions and the location of the offices and the warehouses servicing them are as follows. The Chicago Region, encompassing Indiana and portions of Illinois, Iowa, Kentucky, Michigan and Wisconsin, maintains offices in Des Plaines, Illinois. The Ohio Region, encompassing all of Ohio and portions of Kentucky, Michigan, New York, Pennsylvania, and West Virginia, maintains offices in Stow, Ohio. The Baltimore Region, encompassing all of Connecticut, Delaware, Georgia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, North Carolina, Rhode Island, South Carolina, Vermont, Virginia, and portions of Florida, New York, Pennsylvania, Tennessee, and West Virginia, maintains offices in Baltimore, Maryland. The Minneapolis Region, encompassing all of Minnesota, Montana, North Dakota and South Dakota, and portions of Iowa, Michigan, Wisconsin, and Wyoming, maintains offices in Minneapolis, Minnesota. The Dallas Region, encompassing all of New Mexico, and Texas, and portions of Arkansas, Louisiana, and Oklahoma, maintains offices in Dallas, Texas. The Kansas City Region, encompassing all of Kansas and Nebraska, and portions of Arkansas, Colorado, Illinois, Iowa, Missouri, Oklahoma and Wyoming, maintains offices in Kansas City, Missouri. The Memphis Region, encompassing all of Alabama, Mississippi, and portions of Arkansas, Florida, Illinois, Louisiana, Kentucky, Missouri and Tennessee, maintains offices in Memphis, Tennessee. The Los Angeles Region encompassing all of Arizona, Alaska, California, Hawaii, Idaho, Nevada, Oregon, Utah, Washington, portions of Colorado and Wyoming, and the island of Guam, maintains offices in Los Angeles, California.

Each of the Ben Franklin Regions has been divided into three to five "areas" each of which in turn has been divided into three to six "zones". A Retail Sales Manager is assigned to each "zone" of operations. Since 1960 those managers are the persons with whom the franchisees have had the most frequent contact as they have visited the franchised stores to provide information and help the franchisees on merchandise selection, store layout, competition, store procedures, filing of claims, advertising, promotional programs, displays, accounting, pricing, industry data, and, in general, techniques for operating a successful store.

City Products Corporation is the owner of the United States Patent Office registered service mark "Ben Franklin" issued September 7, 1954, and May 8, 1961, for services to retail variety store owners. It is also the owner of United States Patent Office registered trademark, "Ben Franklin" issued July 26, 1975, which applies to certain types of men's, women's and children's clothing. In its franchise operation, City Products through its Ben Franklin Division enters into franchise agreements with each of its franchisees. Generally, under those agreements, City Products grants to the franchisee the right to use the "Ben Franklin" name in connection with the operation and advertising of a retail store and to provide certain other services to the franchisee.

The franchise agreements which have been entered into between City Products and Ben Franklin franchisees have been in substantially the same form since 1960. The agreements have normally been entered for a five year term on forms furnished by City Products. The franchise form agreement establishing the current rights and obligations running between City Products and substantially all of its franchisees who own four or fewer franchised stores is form number 1540 (R7–65) which was first used in 1965.[8] Virtually all current franchisees have executed this form agreement which does not vary substantially from the form franchise agreements utilized by City Products since 1960. Occasionally, the printed terms of the form franchise agreements are amended or deleted depending on the particular circumstances of the franchisee. However, these amendments and deletions rarely are made to those portions of the agreements which are pertinent to the claims asserted in this civil action.[9]

Under the franchise agreements in effect from 1960 to 1972 each franchisee has paid to City Products an annual franchise fee. Those fees have ranged from $594.00 to $1,500.00, and have been based on the anticipated volume of annual sales for newly franchised stores, or on renewal of the franchise the average annual volume of sales for the previous franchise term.[10] The franchise fee paid by the franchisees to City Products does not cover all of the items and services which City Products may supply to the franchisees through the Ben Franklin Division. More specifically, the franchise fees do not include such services as accounting systems, store development and layout, rent on subleases from City Products, promotional circulars, merchandise, fixtures, or outside signs.

8. Since February 11, 1960, City Products Corporation has utilized various form franchise documents to express the terms of its franchise agreements with Ben Franklin franchisees. The following franchise forms were utilized during that period:
BF 1540 (R1–56)
BF 1540 (R 6–60) (replaced 1540 (R1–56))
CP 1540 (8–64) (replaced 1540 (R6–60))
CP 1540 (R7–65) (replaced 1540 (8–64))
The last two digits of the form above indicate the year the particular form was first used.

9. The most obvious and common variance from the standard form franchise agreement is the supplemental agreement which is executed between the franchisee and City Products when the franchisee is operating 5 or more franchised stores. Another common amendment to the standard form franchise agreement is to paragraph 1 of Schedule A which pertains to the name under which the franchisee is to conduct his business if that name is other than "Ben Franklin".

10. In the event that anticipated annual sales are not met, there have been reductions in the franchise fee charged to bring the fee into line with actual sales.

### b. *Merchandise Distribution*

Since 1960, operating through its seven or eight Regional Distribution Centers the Ben Franklin Division has engaged in the activity of selling and distributing merchandise to its franchisees, and to some non-franchised stores referred to as "combination stores".[11] In general, under the merchandise distribution system, the Division has supplied its franchisees and other customers with information on merchandise, basic and seasonal stock lists of available merchandise and printed or punch card forms to be used by the franchisee or customer in placing orders for the merchandise. Merchandise can be ordered directly from the Distribution Center, indirectly from a supplier or manufacturer through the Distribution Center, or in some instances directly from the manufacturer with billing for the purchase through the distribution center. It has been the practice and policy of the Division that all merchandise ordered by franchisees from or through the Division on order forms supplied by it be billed through the Division. In other words, the Division pays the manufacturer's or supplier's invoice for the order and subsequently invoices the franchisee or customer showing the franchisee's cost, a suggested retail price and percentage markup. Merchandise supplied to franchisees is paid for subsequent to receipt, as opposed to C.O.D. terms, on terms and at prices which are generally applicable to all franchisees. Franchisees and other customers are permitted to order merchandise from or through the Division in relatively small quantities, and delivery is usually on a weekly basis through trucks operated by the Division or common carrier. City Products does not impose a charge in addition to the franchise fee for the service of supplying franchisees with suggestions as to marketing techniques, detailed invoices, stock and seasonal check lists, order forms, lists of new available merchandise, or lists of promotional items. However, it does impose handling charges and except for a few isolated sales it does not sell merchandise to franchisees at its cost. Rather, City Products operates its distribution system so as to realize a gross profit on sales of merchandise to franchisees.[12]

As an example of the size and scope of the Ben Franklin Division's merchandise distribution operation, the evidence established that during the year 1973, each of the eight distribution centers carried for distribution approximately 10,000 different staple merchandise items, 5,000 additional seasonal items, and 2,000 additional promotional items.[13] Through the use of the supplied stock lists, the Distribution Centers also made available by order for factory shipment from suppliers approximately 80,000 additional merchandise items. During the period 1970–1971, the Distribution Centers were supplied by approximately 3,800 different suppliers of merchandise.

Since 1960, the Ben Franklin Division has not been the exclusive distributor of any item or class of merchandise. However, the Distribution Centers do distribute to the stores serviced by them certain items of

---

11. "Combination stores" are normally grocery stores or other retail stores which receive only one line of their merchandise from the Ben Franklin Division Distribution Center, e. g. the cosmetic and drug line. The agreement between these stores and City Products is referred to as a "Merchandise Service Agreement".

12. The markup on merchandise distributed to franchisees by the Distribution Centers or billed through the Ben Franklin Division is not usually determined on a percentage basis. Rather, items are marked up on an individually determined basis or grouped into categories and marked up on a group basis without regard to the cost of an individual item within the group. The markup within the group may range from 0% to 50% on the individual items. The selling price to the franchisees and the markup of items or groups of items is determined without regard to ultimate reductions in cost of the item to the Division which may occur as a result of rebates paid by suppliers at the end of the year based on the volume of purchases.

13. "Seasonal" items are those which are in demand only during certain times of the year, and "promotional" items are those which are normally offered on a one-time reduced cost basis. Promotional items sometimes duplicate a staple or seasonal item.

merchandise which carry a private brand of the Ben Franklin Division. These private brand items are not normally sold to distributors of retail merchandise or to retail stores not serviced by the Distribution Centers. During the period 1968–1972, the Division has not sold or distributed merchandise carrying the private brand or trademark "Ben Franklin".

In addition to the distribution and sale of merchandise to franchisees and "combination stores", the Distribution Centers also supply merchandise to a relatively small number of Ben Franklin retail stores which are owned and operated by City Products Corporation and to approximately 60 "Scott" stores which are owned and operated by T. G. & Y. Merchandise supplied to these stores is billed through the use of an intercorporate credit voucher or accounting entry at cost plus 5% for warehouse merchandise and at cost plus 2% for factory orders.

The evidence presented indicates that since 1960 the Ben Franklin Division of City Products has made an effort which is directed to all franchisees to encourage the franchisees to purchase their retail merchandise from or through the Ben Franklin Division Distribution Centers. The Division has during the period from 1960 to 1972 attempted to determine and keep records of the purchases of its franchisees from or through the Distribution Centers as compared to purchases from independent sources, and the term "compliance" has been used by the officers and employees of the Division to indicate the percentage of a franchisee's total purchases which have been from or through the Division. The Ben Franklin Division has requested its suppliers of merchandise not to sell or bill merchandise directly to its franchisees, but rather to handle all transactions through the Division. And, during the period 1968 to 1972 it has on occasions contacted its franchisees concerning the percentage of merchandise bought from or through the Division in an effort to increase that percentage. Franchisees have since 1960 purchased a large percentage of their merchan-

dise from or through the Division's Distribution Centers.

Since 1972, the Ben Franklin Division has categorized its franchised stores into three basic categories: Family Centers (17,000 or more sq. ft.); Expanded Variety (10,000–17,000 sq. ft.); and Variety (less than 10,000 sq. ft.).

#### c. *Store Development Services*

Operating primarily through personnel in its Regional Distribution Centers the Ben Franklin Division carries on various activities in connection with the opening of newly franchised retail stores or the remodeling of established franchised stores. These services include the following.

The Division prepares in connection with a proposed franchised store and a remodeling what is referred to as "marketing survey" or "merchandise survey". These documents set out for the franchisee matters such as prospective trade areas, population density, type of expected trade, expected competition, and anticipated sales volumes. The Division also in many instances negotiates and prepares the lease for the store premises. Additionally, the Division in connection with the opening or remodeling of a store provides plans for the arrangement of the merchandise in the store and provides personnel to set up the store and participate in the management of the store during the opening. These store development services are usually provided to all franchisees at the time of a store opening or remodeling, and a charge separate from the franchise fee is made for each of the services. The charges assessed for the marketing and real estate services are based upon the projected annual sales volume of the store. The fees charged for personnel to layout and aid in the store opening are based on a weekly charge per man. The fees assessed for store development are set by the Division headquarters and are not usually negotiable on a regional basis.

#### d. *Fixture Merchandising*

In addition to the distribution and sale of merchandise for retail sale by the fran-

chisees, and other customers, the Division also markets store fixtures and exterior signs to the franchisees. These fixture and signs are marketed to the franchisees on a profit basis; the average markup on some fixtures and signs being 20%. The Division obtains the fixtures and signs for resale from various sources, and there is no evidence to establish that all or substantially all of the franchisees are supplied with or encouraged to use similar fixtures, or that the Division attempts to maintain a similar physical appearance for its franchised stores.

### e. Lease Operations

City Products has on a large number of the store premises occupied by Ben Franklin franchisees the underlying lease from the owner of the structure.[14] On those premises City Products subleases the premises to the franchisee at a rate which is in most circumstances higher than the rate it pays to the owner of the premises. The difference in the lease rate and the sublease rate is referred to by the Division as "rent override", the rate of which has been since 1969 governed by written Standard Procedures for the Division.

### f. Accounting Services

City Products, through the Ben Franklin Division, operates and provides to its franchisees a retail mail accounting service. This service includes the setting up of an accounting program when the store is developed or commences its subscription to the service, and the providing of basic accounting documents and records which are prepared from the data submitted by the franchisee. The setting up of and the maintenance of the accounting program are the subject of separate charges which are based on the annual volume of business of the franchisee receiving the service. The accounting service is not designed for use or used by "combination stores", "chain stores", stores which are distant from a distribution center (Alaska and Hawaii), or stores which had developed a system of their own during the 1950's when the accounting system was introduced. As of September 1, 1972, there were approximately 900 franchised stores subscribing to the accounting service of the Division. All franchised stores which subscribe to the accounting service in addition to other accounting documents, are provided with a periodic statement showing separately their purchases from or through the Distribution Center and their purchases from independent sources.

### g. Operation of Retail Stores

During the period 1968 through 1972, City Products owned and operated several retail stores under the name "Ben Franklin". These retail stores were either managed by the Regional Offices of the Ben Franklin Division or as a separate administrative unit by a separate sub-division of City Products, and they were supplied and serviced by the Ben Franklin Regional Distribution Centers and Offices.

The locations of the nine City Products owned and operated Ben Franklin Stores as of September, 1972, were as follows: Connersville, Indiana; Northwoods, Missouri; Clarinda, Iowa; Moberly, Missouri; Englewood, Ohio; Toledo, Ohio; Freemont, California; and Indianapolis, Indiana. During the period 1960–1972 City Products owned and operated from 5 to 14 Ben Franklin Stores, and owns and operates several "Ben Franklin" retail stores at the present time.

### h. Chain Store Franchising

Included in the previously discussed franchise operations of the Ben Franklin Division is the separate category of franchisees referred to as "chain stores". These franchisees, who are not included in the class of potential plaintiffs as defined by plaintiffs herein, are those who own 5 or more "Ben Franklin" franchised stores concurrently. Chain store franchisees operate and are serviced similarly to other franchisees with the exception that if they achieve an established annual volume of sales they receive a

---

**14.** As of June 1973, 23.8% of the franchisees subleased store premises from City Products.

1% or 2% discount of all merchandise purchased from the Ben Franklin Division.

As of September 1, 1972, twenty-one franchisees owned and operated 177 franchised "Chain Stores" located in 22 states. The location of these Chain Stores by Ben Franklin Region was as follows: Chicago, 31; Ohio, 0; Baltimore, 35; Minneapolis, 6; Dallas, 24; Kansas City, 40; Los Angeles 6; and Memphis, 35.

### i. *Management and Activities*

The majority of the activities of the Ben Franklin Division of City Products are conducted from the Regional Offices and Distribution Centers. However, the evidence establishes that the regions are centrally directed from the Division headquarters, and that the Division has attempted to develop and has developed some uniformity in operations through the use of statements of Company policy and written Standard Procedures for many functional areas within the business. Even so, the responsibility and capability of the Regional Managers is such that they are responsible for the day to day decisions necessary to service the franchisees, and more importantly the majority of the contact between the Ben Franklin Division and its franchisees comes from the Regional Managers or their subordinates in the "areas" and "zones" of their Region.

With regard to the areas of central direction, the evidence establishes that during portions of the period 1968–1972, the Regional Managers did not have plenary power to make all decisions concerning potential or current franchisees. More specifically, they did not have authority without headquarters approval to grant or renew franchises, lease premises, negotiate with

suppliers concerning price, approve certain types of direct factory orders, or grant reductions in certain fees established by the Ben Franklin Division.

### 3. *Coordinated Activities of T. G. & Y. and Ben Franklin*

Although as can be seen from the above discussion the subsidiary, T. G. & Y., and the Ben Franklin Division maintain a large degree of separation in their activities, there does exist between the two operations a degree of coordination of activities and some exchange of business information. Since 1970 there has been a limited amount of coordination between the operations with respect to purchases of merchandise from suppliers both domestic and foreign, and there have been exchanges of information regarding the prices at which merchandise has been obtained from various suppliers. The operations have exchanged merchandise lists or stock lists, and have exchanged lists showing the locations of stores franchised or operated by them. There has been since 1960 an effort on the part of both the Ben Franklin Division and T. G. & Y. to avoid the location of their stores in close proximity to each other.

### B. *Activities and Identification of the Named Plaintiffs*

The named plaintiffs in this action represent the owners and operators of 11 Ben Franklin franchised retail stores which were during the period January 1, 1960, to April 7, 1972, and are presently located in the states of Missouri, Kansas, and Indiana. With regard to all of those named plaintiffs, and the stores owned and operated by them, the evidence establishes the following.[15]

---

**15.** It is at this point necessary to note the tremendous confusion which has been created in this action by plaintiffs' use of the term "period in suit" in their documentary proof. In the initial stages of this litigation, including the stages wherein plaintiffs' submitted narrative statements to defendants, the term "period in suit" as used in all of plaintiffs' narrative statements was defined as the period from January 1, 1960, until April 7, 1972. Responses were

made to plaintiffs' narrative statements on the basis of that definition. Prior to the evidentiary hearing on the plaintiffs' class action motion, apparently in an effort to narrow the class action claims and simplify the issues in this litigation, plaintiffs' counsel redefined the "period in suit" insofar as some of plaintiff's evidence was concerned to the period April 7, 1968, to April 7, 1972. Thereafter immediate confusion set in when at the evidentiary hear-

Each of the named plaintiffs was a Ben Franklin franchisee for some part of the period commencing in 1960 and ending in 1972, and while a franchisee paid a franchise fee to the Ben Franklin Division of City Products based on a standard fee schedule which took into account the volume of sales for the franchisee's preceding franchise term or the anticipated volume of business for a new store. With the exception of plaintiffs Victor and Geraldine Chmieleski, each of the named plaintiffs at some time during the period 1960–72 executed the Ben Franklin franchise form entitled "Ben Franklin Franchise Agreement" No. 1540 (R7–65) on at least one of their stores. The Chmieleskis executed Form No. 1540(8–64) which was identical in all material respects to the form executed by the remaining plaintiffs. Although there were minor modifications in some of the franchise agreements executed by the named plaintiffs on stores not mentioned in their complaint, with regard to the stores which form the basis of the plaintiffs' complaints the franchise agreements were identical in all material respects.

Under their franchise agreement, each of the named plaintiffs has at some time during the period 1960–1972 owned and operated a Ben Franklin franchised store under the name "Ben Franklin", and none of them owned or operated 5 or more Ben Franklin

franchised stores contemporaneously. During that time in addition to the franchise fee, each of the named plaintiffs paid an additional charge for such services as accounting services, rent, promotional circulars, fixtures, outside signs, merchandise, and store development if such services were received by them during the period 1960 to 1972. Each of the named plaintiffs, except plaintiff Cruse, subscribed to the Ben Franklin Accounting Service at some time during the period 1960–1972. Each of the named plaintiffs purchased some store fixtures and outside signs from City Products during the period 1960–1972, and those plaintiffs who opened a new store during the period mentioned purchased the majority of their store fixtures and opening merchandise from City Products. Each of the named plaintiffs, except Grant and Velma Hallacy, has subleased store premises from City Products at some time during the period 1960–1972, and during that same period each purchased the majority of their merchandise from the Ben Franklin Division and purchased promotional circulars from the Ben Franklin Division. Each claims that the prices on the circulars are set by Ben Franklin and that they are too low for him to realize a profit.

During the period 1960 to 1972, the named plaintiffs have operated Ben Franklin franchised retail stores at the following locations.[16]

ing in this matter plaintiffs offered admissions and other evidence pertaining to the period 1960–1972 to establish factual matters relating to the relevant time period of 1968–1972. Obviously, an admission that a particular event occurred during the period 1960–1972 does not in all circumstances establish that the event occurred during the period 1968–1972. In an attempt to cure this apparent defect in their proof, plaintiffs have filed with the Court a document entitled "Plaintiffs' Documentation of Narrative and Affirmative Statements Using the Term 'Period In Suit'". Through this 230 page document, plaintiffs have endeavored to establish by evidence offered at the hearing the fact that events which were previously stated to have occurred during the period 1960–1972 also occurred during the period 1968–1972.

The problems and confusion which has been created by plaintiffs' modification of definition of the term "period in suit" becomes more apparent when it is observed that plaintiffs

have established that all of the named plaintiffs were Ben Franklin franchisees for some time during the period 1960 to 1972, but have failed to establish the basic fact that plaintiffs Gabel, Synnes, Bell, Hallacy or Schwartz, were Ben Franklin franchisees during the period April 7, 1968, to April 7, 1972, or that they did business under the name "Ben Franklin" during that time. The Court has attempted to resolve the confusion by indicating where it is deemed pertinent the specific years for which the particular fact is established. The consequences of the confusion and lack of proof will become apparent in the discussion of the relevant Rule 23 considerations.

**16.** As previously mentioned, not all of the stores operated by a particular plaintiff are the subject of plaintiffs' complaint. Those stores not mentioned in plaintiffs' complaint are: (1) Schwartz, Des Moines; (2) Bell, Glenwood, Iowa and Higginsville, Mo., and (3) Cruse, Carmel, Zionsville, and Brownsburg, Indiana.

| (1) | Chmieleski | (a) | Locust Street Chillicothe, Missouri |
| | | (b) | Southtown Center Chillicothe, Missouri |
| (2) | Schwartz | (a) | Des Moines, Iowa |
| | | (b) | Parkville, Missouri |
| (3) | Williams | (a) | Warrensburg, Missouri |
| (4) | Bell | (a) | Glenwood, Iowa |
| | | (b) | Higginsville, Missouri |
| | | (c) | Lexington, Missouri |
| (5) | Hallacy | (a) | Overland Park, Kansas |
| (6) | Augusta Variety | (a) | Indianapolis, Indiana |
| (7) | Cruse | (a) | Carmel, Indiana |
| | | (b) | Zionsville, Indiana |
| | | (c) | Brownsburg, Indiana |
| | | (d) | Beech Grove, Indiana |
| (8) | D. M. & D., Inc. | (a) | Station Street Indianapolis, Indiana |
| | | (b) | Washington Street Indianapolis, Indiana |
| (9) | Gabel | (a) | Greenfield, Indiana |
| (10) | Sites | (a) | Lawrence, Indiana |
| (11) | Synnes Variety, Inc. | (a) | Indianapolis, Indiana |

Each of the named plaintiffs claims with respect to at least one of their stores that at some time suppliers of retail merchandise have refused to sell merchandise to the store unless the billing was through the Ben Franklin Division. And, each of the named plaintiffs claims that he or she has not acquired an interest in a variety store other than a Ben Franklin franchised store because their franchise agreement gives the Ben Franklin Division the right to cancel their franchise agreement if such an interest is acquired.

Plaintiffs Schwartz, Hallacy, and Williams claim that at some time during the period 1960–1972 a Ben Franklin Store operated by them experienced competition from a T. G. & Y. Store. Plaintiffs Augusta Variety, Inc., Cruse, D. M. & D., Inc., Gabel, Sites, and Synnes, claim that at some time during the period 1960–1972 a Ben Franklin Store operated by them experienced competition from one or more of the Ben Franklin company owned stores in the Indianapolis, Indiana metropolitan area. Those plaintiffs also claim that at some time during the period 1960–1972 they experienced competition from a Ben Franklin Store which was located in the Indianapolis, Indiana area and owned by the Schwarten Corporation, an entity which owned five or more franchised Ben Franklin stores contemporaneously.

Only 6 of the named plaintiffs offered testimony at the evidentiary hearing on their motion to proceed with their complaints under Rule 23, F.R.Civ.P. The witnesses testifying on behalf of those plaintiffs were: (1) Charles R. Cruse; (2) Victor Chmieleski; (3) Fred Sites; (4) William Enmier (Augusta Variety, Inc.,); (5) Monroy J. Wolfe (D. M. & D. Inc.,); and (6) Robert Williams. With regard to the plaintiffs who offered oral testimony through these witnesses, the Court makes the following findings.

Plaintiff Charles Cruse, who currently resides in Zionsville, Indiana, has owned and operated his store in Beech Grove since 1952, doing business under the "Ben Franklin" name. Other Ben Franklin franchised stores owned and operated by Mr. Cruse include: Zionsville, Indiana, operated under the name "Cruse and Company" until sold in 1965; Carmel, Indiana until sold in 1955 and Brownsburg, Indiana until sold in 1955. During the period 1968–1972 the Beech Grove ("Ben Franklin" store currently in operation by Mr. Cruse was the subject of a Form 1540 (R7–65) Ben Franklin franchise agreement. Mr. Cruse has not and does not lease his Beech Grove store premises from the Ben Franklin Division of City Products, and has not subscribed to the retail accounting system during the period 1968–1972.

With regard to the operation of his Beech Grove store, Mr. Cruse has since its opening purchased the majority of his merchandise from the Ben Franklin Division. He does not claim that the Ben Franklin Division has put pressure on him to purchase merchandise from Ben Franklin, but does claim that outside suppliers have refused to sell to him directly. Mr. Cruse purchased fixtures for his Beech Grove store from the Ben Franklin Division in 1972, and a Ben Franklin sign during the period 1968–1972. He believes that the terms of his Ben Franklin franchise agreement preclude him from owning any interest in a non-Ben Franklin "variety" store. He also is of the opinion that during the period 1968–1972 his Ben

Franklin store in Beech Grove was in competition with the three company owned Ben Franklin stores located in the Indianapolis, Indiana area. During the period 1968–1972 there were company owned Ben Franklin stores located from 3.5 to 25 miles away from Mr. Cruse's Beech Grove Store. Prior to the institution of this civil action, Mr. Cruse was not aware that the Ben Franklin Division received rebates and allowances from its suppliers.

Victor Chmieleski, who currently resides in Chillicothe, Missouri, owned and operated a Ben Franklin franchised store in downtown Chillicothe from 1961–1966 and a Ben Franklin franchised store in a shopping center in Chillicothe from 1966 until 1971. Both stores did business under the "Ben Franklin" name. He is not currently a Ben Franklin franchisee and has no intention of becoming one. For sometime during the period 1968–1972 the shopping center store owned and operated by Mr. Chmieleski was the subject of a Form 1540 (8–64) Ben Franklin franchise agreement.

During the period 1968–1972, the store premises for the Chmieleski store was subleased from the Ben Franklin Division at a rental in excess of that paid by Ben Franklin to the owner of the property, and Mr. Chmieleski did subscribe to the Ben Franklin accounting program during his store operation.

In operating both of his stores, Mr. Chmieleski purchased the majority of his merchandise from the Ben Franklin Division and claims that he was pressured by the Division to do so. He claims that outside suppliers refused to sell merchandise to him directly. Mr. Chmieleski did not purchase fixtures or signs for his stores during the period 1968–1972, and during the time he operated neither of his Ben Franklin Stores were in competition with any company owned Ben Franklin Store, T. G. & Y. Store or Scott Store. He was not aware that the Ben Franklin Division received rebates and allowances from suppliers prior to the institution of this action.

Plaintiff Fred Sites, who currently resides in Lawrence, Indiana and presently owns and operates a Ben Franklin franchised store in Lawrence, has owned and operated his store since 1959 under the "Ben Franklin" name. Mr. Sites' store is located in the Indianapolis, Indiana Metropolitan Area, and like Mr. Cruse, he claims that he experienced competition from the three company owned Ben Franklin stores located in that area during the period 1968–1972. Mr. Sites' store was during the period 1968–1972 and is the subject of a Form 1540 (R7–65) Ben Franklin franchise agreement. The store premises are leased by him from the Ben Franklin Division, and he has subscribed to the Ben Franklin accounting system since the inception of his franchise in 1959.

Mr. Sites has purchased the majority of his store merchandise from the Ben Franklin Division, and claims that he has felt pressure to do so. He purchased some fixtures from Ben Franklin in 1968. He claims that outside suppliers have refused to sell merchandise directly, or without billing the sale through the Ben Franklin Division. He was not aware of the fact of rebates and allowances from suppliers to the Ben Franklin Division prior to the institution of this suit.

William Enmier, who with his wife owns the majority of the stock in plaintiff Augusta Variety, Inc., presently resides in Indianapolis, Indiana. He testified that due to his feeling of pressure from the Ben Franklin Division, Augusta Variety has purchased the majority of its merchandise from the Division. In 1968 Augusta Variety remodeled its Ben Franklin Store in Indianapolis, Indiana which has been operated under the "Ben Franklin" name by Mr. Enmier since 1958. Augusta Variety leases the premises for its store from the Ben Franklin Division of City Products Corporation, subscribes to the Ben Franklin accounting service and has a Form 1540 (R7–65) franchise agreement. In 1968, in connection with the remodeling of its store, Augusta Variety purchased fixtures from the Ben Franklin Division and paid a fee to the Division for a "re-lay" of the store. Mr. Enmier claims that during the period 1968–

1972 the three company owned Ben Franklin Stores in the Indianapolis area competed with the store owned by Augusta Variety, Inc.

Monroy J. Wolf, the majority shareholder in D. M. & D., Inc., testified on behalf of that plaintiff corporation. His testimony established that the corporation is not presently a Ben Franklin franchisee. However, during the period from 1969 until January 1974, D. M. & D., Inc., owned and Mr. Wolf operated a Ben Franklin franchise store on West Washington Street in Indianapolis, Indiana. That store was the subject of a Form 1540 (R7–65) Ben Franklin franchise agreement, did business under the "Ben Franklin" name, leased its premises from City Products, and subscribed to the Ben Franklin accounting service. Additionally, during the period July 1966 until 1971, D. M. & D., Inc., owned a Ben Franklin franchised store located on Station Street in Indianapolis, Indiana. That store was also the subject of a Ben Franklin franchise agreement, and subscribed to the Ben Franklin accounting service. With regard to both of the stores which were owned by Mr. and Mrs. Wolf's corporation and operated by Mr. Wolf, he testified that he purchased approximately 62% of his merchandise from the Ben Franklin Division, and that in 1968 he felt pressure to purchase merchandise from the Ben Franklin Division and to discontinue purchases from outside suppliers. He further testified that in 1970 he had been "cut-off" by outside suppliers.

With regard to company owned stores, Mr. Wolf claims that the Ben Franklin Stores which he operated experienced competition from the three Ben Franklin company owned stores in the Indianapolis area during the period 1968 to 1972. He further stated that prior to this suit he was not aware that the Ben Franklin Division received rebates and allowances from suppliers, and that while his corporation was party to a Ben Franklin franchise agreement, he felt that he was precluded from owning or operating a non-Ben Franklin variety store.

Robert Williams, who resides in Knob Noster, Missouri, presently operates a Ben Franklin franchised store in Warrensburg, Missouri. He has owned and operated that store under the "Ben Franklin" name since November 1965 under a Form 1540 (R7–65) Ben Franklin franchise agreement. During the period from 1965 to 1970 his store subscribed to the Ben Franklin accounting service. However, he has not leased his store premises from the Ben Franklin Division and purchased no signs or fixtures from Ben Franklin during the period 1968–1972. Mr. Williams has purchased approximately 98% of the merchandise for his store from the Ben Franklin Division, and testified that outside suppliers have refused to bill him directly for merchandise purchased under the name of his Ben Franklin store. Mr. Williams considered opening a non-Ben Franklin retail store in 1968 but did not do so because he felt that he was prevented from doing so by his franchise agreement. Prior to the institution of this suit, he was not aware that Ben Franklin received rebates and allowances from suppliers.

Mr. Williams testified that in 1971 a T. G. & Y. store was opened in Warrensburg, Missouri approximately one mile from his Ben Franklin store, and that the T. G. & Y. store is in competition with his store in many lines of merchandise.

## C. Activities of Potential Class Members and Proposed Subclasses

It is stipulated by the parties that the number of active potential class members, as defined in plaintiffs' First Amended Complaint and as they existed as of September 1, 1972, is at least 1,000. And, the evidence establishes that during each of the years 1968 through 1972 inclusive, approximately 100 Ben Franklin franchisees ceased their franchise operations. The evidence which has been presented to the Court with regard to the identification and activities of these "potential class members" is notably deficient in several respects, particularly with regard to the period of time from April 7, 1968 to April 7, 1972. Nonetheless, the Court will summarize the evidence

presented with regard to these past and present "Ben Franklin" franchisees.

Virtually all current Ben Franklin franchisees, who owned four or fewer franchised stores contemporaneously and did business under the "Ben Franklin" name during the period 1968 to 1972, are presently or were party to the five-year term standard form Ben Franklin Franchise Agreement No. (R7–65), or a substantially similar agreement.[17] All of those franchisees paid to City Products Corporation a franchise fee based on their projected or past annual volume of business, and received some services from the Ben Franklin Division in connection with their franchise operation at no additional costs. Franchised "Ben Franklin" stores were in 1972 located in every state of the Union, except Nevada and Delaware. The number of stores operated in 1968 was 2,107 and in 1971 was 1,910.

The size, sales volume, appearance, layout, mix of merchandise, and operation of the "Ben Franklin" franchised stores differs from store to store, and no two franchisees have purchased identical amounts of like merchandise from the Ben Franklin Division of City Products during the period 1968–1972. However, the franchisees were all supplied with similar Ben Franklin stock lists and other lists of available merchandise, and the evidence establishes that they have purchased a large amount of their merchandise for retail sale from or through the Ben Franklin Division Distribution Centers.

All franchisees who opened a new Ben Franklin store during the period 1968–1972 who received store development services or the services of a store opening superintendent, paid an additional fee for those services, and they all paid the initial costs incurred in opening the new store. Those franchisees who obtained the Ben Franklin accounting service during that same period paid a fee for installing the service and an annual fee for that service based on their annual sales volume. Additionally, if . a

franchisee received promotional circulars, merchandise, signs, fixtures, or leased his store premises from City Products during the period 1968–1972 a fee or charge in addition to the franchise fee was paid for the services or items received.

Although there is no evidence to establish the precise number of franchisees who subscribed to the Ben Franklin accounting service during the period 1968–1972, the evidence established that there are presently approximately 900 Ben Franklin stores which subscribe to the retail accounting program offered by City Products to its Ben Franklin franchisees. The evidence does not establish the number of Ben Franklin franchisees who leased store premises from City Products during the years 1968–1972, although there was some indication that as of June, 1973, 23.8% of the franchisees subleased their store premises, that "numerous" franchisees subleased from City Products during 1960–1972, and that the majority of those franchisees paid a rent "override" based on a standard schedule. Plaintiffs have failed to offer evidence with respect to the number or approximate number of franchisees who purchased store fixtures or permanent outside signs from the Ben Franklin Division of City Products during the years 1968–1972, or the total amount of those sales, although the evidence does establish that during the years 1960–1972 some franchisees in addition to the named plaintiffs in this action purchased store fixtures and outside signs from the Ben Franklin Division.

On April 7, 1972, all then current Ben Franklin franchisees were sent a letter by the President of the Ben Franklin Division which purported to delete a portion of paragraph 11(c) of the form 1540 franchise agreement. That letter stated that so much of paragraph 11(c) of the standard Ben Franklin Franchise Agreement as gives City Products the right to cancel the franchise if the franchisee acquires any interest

17. Although available from the files of City Products, the parties have not introduced the individual franchise agreements.

in any variety store except a Ben Franklin Store was being deleted.

The evidence adduced establishes that franchised Ben Franklin stores do compete for sales to consumers in numerous product lines with "chain stores", stores owned by City Products, and stores owned by its subsidiary T. G. & Y., when those stores are located in close proximity to each other or in the same "trade area". However, other than the evidence pertaining to the named plaintiffs herein, plaintiffs have not offered evidence to establish the number of or location of franchised stores which are claimed to have been or presently are in close proximity to or in the "trade area" of a "chain store", a store owned by City Products or a Scott or T. G. & Y. store. Defendants' evidence establishes that as of 1972, 94% of the franchised stores owned by potential class members which were *not* located in a Department of Commerce Standard Metropolitan Statistical Area were not located in the same county as a City Products owned and operated or Scott or T. G. & Y., or "chain store". It further established that 41% of the stores owned by potential class members in 1972 which were located in Standard Metropolitan Statistical Areas had no company-owned and operated, Scott, T. G. & Y., or "chain store" located within that area. In those counties and Standard Metropolitan Statistical Areas where franchised stores and a Scott, T. G. & Y., City Products owned and operated, or "chain store" may both operate, there may be a considerable geographic distance between the stores. During the evidentiary hearing in this cause, plaintiffs' counsel adduced evidence which appeared to express plaintiffs' intention to limit their proof of "geographic market" for the purposes of establishing competition between potential class members and other stores to various "set up statements", "market surveys" and "merchandise surveys" which were conducted and reported by either the Ben Franklin Division or T. G. & Y. Stores Company and purport to define the "trade area" of the stores for which the document was prepared. The testimony with regard to these reports indicated they disclose that there were at least 22 franchised "Ben Franklin" stores owned and operated by potential class members and plaintiffs which were operated in the "trade area" of a store owned and operated by City Products, a Scott store, a T. G. & Y. store or a store operated by a franchisee who operated five or more franchised stores.[18]

Although the testimony of officers and employees of City Products offered by defendants indicated that records were available, including the franchise agreements between potential class members and City Products, which would establish with certainty those potential class members who had been party to the standard form franchise agreement during the relevant period, which could identify those franchisees who had done business under the "Ben Franklin" name and operated four or fewer franchised stores during the period April 7, 1968 to April 7, 1972, which could identify for the years 1968–1972 a portion of those potential class members who had subscribed to the Ben Franklin accounting service, leased their store premises from City Products, and purchased store fixtures or outside signs from the Ben Franklin Division, those documents or detailed summaries of their contents have not been offered in evidence in this matter. It thus appears that in support of their motion to proceed on behalf of the defined class of potential plaintiffs with the previously discussed claims, the proposed class representatives are relying primarily upon the evidence with regard to the activities of the defendants and their suppliers, the evidence offered which pertains to the named plaintiffs in this action, and the evidence which establishes that the Ben Franklin Division of City Products has since 1960 utilized standard forms to express the terms of

---

18. Apparently, plaintiffs have limited themselves to claiming that the stores located in these "trade areas" are those which have suffered competition from allegedly "favored stores" to avoid the problem associated with the individual proof of geographic markets which are by plaintiffs own admissions and proof, essentially local in nature.

their franchise agreement with potential class members. As stated by plaintiffs' counsel, it is contended that "the standard form Ben Franklin Franchise Agreement which all potential class members have executed is the common denominator of the class," and "the focus of this lawsuit is the *standard terms* in the franchise agreement, *standard written procedures* promulgated by the defendants, and a *nationwide conspiracy* which has been injurious to all class members."

The basic problem which has been presented to the Court by plaintiffs' contentions with regard to the Rule 23 issues is the absence of evidence with regard to the precise identification, status, and activities of the potential class members. The evidence on the record in this proceeding, while establishing that it is likely that all potential class members were party to an identical form franchise agreement with City Products during the period April 7, 1968, to April 7, 1972, fails to establish the identity or number of potential class members who actually received the "items" which were allegedly tied to the "Ben Franklin" name and service mark by the "standard" agreement. In fact the evidence establishes that not all potential class members received all of the allegedly tied items or services. Additionally, plaintiffs' evidence fails to establish the identity of or number of potential class members who are alleged to have been in competition with allegedly "favored" stores during the period April 7, 1968, to April 7, 1972.

In recognition of the fact that not all of the named plaintiffs herein are current "Ben Franklin" franchisees requesting injunctive relief, and in view of the evidence which establishes that not all named plaintiffs or potential class members have received all of the items or services which have been allegedly subject to illegal tying arrangements, and not all named plaintiffs or potential class members have operated a retail store in close proximity to or in the "trade area" of an allegedly favored store, the plaintiffs have proposed the following subclasses and subclass representatives in connection with their Rule 23 claims for damages and injunctive relief.

On the "tying of accounting" claim, for damages and injunctive relief, a subclass consisting of all members of the defined class during the period of April, 1968, through April, 1972, inclusive, who have subscribed to and purchased the Ben Franklin accounting system from City Products Corporation is proposed to be represented by current franchisees Schwartz, Williams, Sites and Augusta Variety, Inc., and by former franchisees Chmieleski, Hallacy, Bell, Gabel, and Synnes Variety, Inc.

On the "tying of premises" claim, for damages and injunctive relief, a subclass consisting of all members of the defined class during the period April, 1968, through April, 1972, inclusive, who have subleased from City Products Corporation the store premises for their Ben Franklin store and have paid City Products a rent "override" is proposed to be represented by current franchisees Schwartz, Augusta Variety, Inc., and Sites, and former franchisees, Bell, Synnes Variety, Inc., D. M. & D., Inc., and Gabel.

On the "tying of fixtures and signs" claim, for damages and injunctive relief, a subclass consisting of all members of the defined class during the period April, 1968 through April, 1972, inclusive, who have purchased store fixtures and/or the permanent "Ben Franklin" sign displayed on the exterior of their store premises from City Products Corporation is proposed to be represented by current franchisees Schwartz, Augusta Variety, Inc., Sites and Cruse, and by former franchisees Bell, Synnes Variety, Inc., D. M. & D., Inc., and Gabel.

On the "tying of retail merchandise claim", for damages and injunctive relief, a subclass consisting of all members of the defined class during the period April, 1968, through April, 1972, inclusive, who have purchased goods and merchandise from City Products Corporation for their Ben Franklin stores is proposed to be represented by all named plaintiffs in this action, including both current and former franchisees.

On the "confidential rebates claim" for damages and injunctive relief, a subclass consisting of all members of the defined class during the period April, 1968, through April, 1972, inclusive, who have purchased goods and merchandise from City Products Corporation for their Ben Franklin stores is proposed to be represented by all named plaintiffs in this action, including both current and former franchisees.[19]

On the "price discrimination" claims for damages and injunctive relief, a subclass consisting of all members of the defined class during the period April 1968 through April 1972, inclusive, who have competed with either a "chain store" (a Ben Franklin store owned and operated by a franchisee owning five or more Ben Franklin stores contemporaneously) or with a "company owned" store carrying either the "Ben Franklin", "Scott", or "T. G. & Y." name is proposed to be represented by current franchisees Schwartz, Williams, Augusta Variety, Inc., Sites and Cruse, and by former franchisees Hallacy, Synnes Variety, Inc., D. M. & D., Inc., and Gabel.

On the "encroachment" claims and "exclusive dealing" claims requesting injunctive relief only, a subclass consisting of all persons who presently own four or fewer Ben Franklin variety stores at the same time, are party to the "Ben Franklin Franchise Agreement" with City Products Corporation whereby they are doing business under its trademark, "Ben Franklin", is proposed to be represented by current franchisees, Schwartz, Williams, Augusta Variety, Inc., Sites and Cruse.

## III. RULE 23 DETERMINATIONS

### A. *Preliminary Observations*

In the context of the previously discussed claims and factual background, the appropriate determinations must at this point be made with regard to class claims and subclass claims sought to be presented by plaintiffs as representative parties under Rule 23(b)(1), (2) and (3). Prior to the discussion of the Court's conclusions with regard to the specific Rule 23 issues, the Court will take up some preliminary problems which have surfaced in the consideration of plaintiffs' Rule 23 request.

Initially, it should be pointed out that since the filing of their First Amended Class Action Complaint on April 7, 1972, the named plaintiffs in this action have modified the class of persons whom they seek to represent and abandoned numerous claims which they originally sought to present on behalf of the potential class members. In their original class action complaint, the proposed class of plaintiffs as defined consisted of:

> "All persons who own or have owned four (4) or fewer Ben Franklin variety stores at the same time and who have entered into the 'Ben Franklin Franchise Agreement' with the defendant City Products whereby they did and or/are doing business under its trademark, 'Ben Franklin', in the period in suit."

At that stage of the litigation, the "period in suit" as used in the definition of the proposed class was the period commencing "at least as early as 1960" and "continuing thereafter to the present date". In general terms, the substantive claims which were asserted in the First Amended Complaint on behalf of the defined class and the named individual plaintiffs, in addition to broad allegations of combination and conspiracy in violation of the federal antitrust laws, and request for injunctive relief, contained approximately nineteen alleged violations of antitrust laws including the following: claims that potential class members had been coerced into enlarging or remodeling stores; claims that potential class members had been coerced into relocation of stores; claims that potential class members had been coerced into maintaining the resale price of merchandise at certain levels; claims that potential class members had been forced to accept merchandise not

---

**19.** Plaintiffs have not included in this subclass those members of the defined class during the period January 1, 1960, through April, 1968.

wanted by the defendants at prices in excess of the value thereof; claims of price discrimination; claims that potential class members were coerced into purchasing goods, merchandise, fixtures, signs, accounting systems, and other services as a condition to using the "Ben Franklin" trademark; claims that potential class members were coerced to sublease store premises from City Products; claims that potential class members were compelled to use all advertising and promotional material sent to them; claims that potential class members were precluded from acquiring an interest in a variety store other than a Ben Franklin franchised store; claims that potential class members had been forced to cease obtaining merchandise and promotional services from outside suppliers; claims of fraudulent misrepresentation made to potential class members regarding the volume of business to be expected; claims of failures to disclose rebates from suppliers; and claims of injury and damages arising from these alleged acts. Subsequently, in their *"Statement Concerning Class Action Issues"* plaintiffs restated these claims sought to be presented on behalf of the proposed class.

As has previously been pointed out, just prior to the evidentiary hearing in this cause, plaintiffs filed a document entitled *Plaintiffs' Amended Statement Concerning Class Action Issues,* wherein plaintiffs stated their purpose was to "clarify the class action questions presented" and to "evidence the manageability of the class action." In that document, plaintiffs stated that with one exception, "the class would be limited to persons falling within the class definition beginning April 7, 1968 and ending at the time of trial" and that "plaintiffs will later file appropriate pleadings to encompass the period subsequent to the date of the filing of the First Amended Class Action Complaint". The exception indicated was with regard to the claim of "confidential rebates" received from suppliers. On that claim plaintiffs stated the original class definition would apply and that dam-

ages would be sought from the year 1960.[20] Additionally, in their *Amended Statement,* plaintiffs set forth the claims previously outlined in this Memorandum with which they at that time proposed to proceed on behalf of the potential class members.

Apparently, subsequent to the submission of their *Amended Statement,* plaintiffs again determined to limit the size of their proposed class, as they subsequently defined the proposed class for all claims except the "confidential rebate" claim to those franchisees with four or fewer stores doing business under the "Ben Franklin Franchise Agreement" and "Ben Franklin" name during the period April 7, 1968, through April 7, 1972; thus deleting from the class those defined class members who had become franchisees during the period April 8, 1972, through the time of trial. More importantly, during the Court's evidentiary hearing plaintiffs confined the period of time for which damages are sought on behalf of the class to that period of time ending on April 7, 1972, thus narrowing the class damage claim. Plaintiffs have not as of the date of this Memorandum filed their amended pleading which was represented to "encompass the period subsequent to the date of the filing of the first amended complaint" and apparently do not intend to do so. To further compound the confusion, plaintiffs continue to allege that the illegal acts which form the basis of their substantive claims have continued through the present time and that injunctive relief is necessary to adequately protect themselves and class members from further alleged illegal acts and practices. Furthermore, plaintiffs in their proposed findings of fact proposed a subclass of potential class members on their "confidential rebate" claim which includes only those franchisees operating during the period April 1968 through April, 1972, apparently intending to abandon the pre-1968 "confidential rebate" claims of those franchisees in their defined class who operated during the period 1960 to April 7, 1968 and to entirely delete from the proposed class those persons who operated only during the

---

**20.** The claim of fraudulent concealment was asserted in this claim.

period 1960 to 1968. Additionally, during the evidentiary hearing the plaintiffs proposed to include in the subclass of plaintiffs seeking damages for alleged price discrimination only those who are shown to be in the "trade area" of an allegedly "favored" store by documents compiled and prepared by the defendants, as opposed to those which may be shown to be located within the geographic market of an allegedly "favored" store by the means and methods normally applicable.

Although plaintiffs' continuous modification of the claims which they seek to present on behalf of other persons, and modification of the class of persons whom they seek to represent, has created confusion in the record in this case, that confusion can be remedied. However, as the record in this litigation now stands, the named plaintiffs in this cause are presently seeking to maintain a limited number of claims on behalf of other persons for a limited period of time, while at the same time they are asserting in their First Amended Class Action Complaint much broader claims on behalf of themselves. The Court cannot determine if this particular situation has been intentionally created by plaintiffs or has been created by them without a realization that statements of record abandoning claims to be presented on behalf of a proposed class do not amount to an abandonment of claims which are asserted by representative parties on behalf of themselves in their pleadings.

It may be that plaintiffs' have failed to realize that they are at this time asserting damage claims on behalf of themselves which extend from 1960 to the time of trial in this cause, and are only seeking to represent parties with damage claims during the period commencing on April 7, 1968, and ending on April 7, 1972. Or, it may be that plaintiffs have intended to abandon any

claims on their own behalf that they are not asserting on behalf of the potential class members, and merely have failed to do so formally. The latter appears more likely as in their reply brief filed in this cause on November 10, 1975, plaintiffs' counsel stated the following:

> "The interests of the named class representatives for each subclass and all members of the subclass are perfectly congruent, since the class representatives are asserting only those claims which are asserted on behalf of the class."

In view of this representation, the Court has for the purposes of its Rule 23 determinations assumed that the plaintiffs as class representatives are seeking to present on their own behalf only those claims, including claims for damages, which they seek to present on behalf of their defined class. Should this assumption later be found to be incorrect, any determination which may be made granting plaintiffs' motion to represent absent class members may be reevaluated pursuant to Rule 23(c) and (d), F.R. Civ.P.

The second preliminary problem which has surfaced in plaintiffs' modification of the substantive claims which they seek to present on behalf of themselves and their proposed class of plaintiffs concerns the absence of a meaningful relation between the claims for damages and injunctive relief. Preliminarily, it should be noted that the substantive claims for injunctive relief pursuant to 15 U.S.C. § 26 asserted in plaintiffs' pleading and *Amended Statement Concerning Class Action Issues* are broad and general in nature. Basically, the plaintiffs request on behalf of themselves and their defined class of plaintiffs orders enjoining all actions which they alleged to be violations of the substantive federal antitrust laws.[21] In connection with their

---

21. Specifically, plaintiffs in their proposed findings of fact and conclusions of law state that with regard to themselves and the defined class they request the following injunctive relief: (1) that which will involve alteration of the standard franchise agreement and practice of City Products; (2) that which will compel defend-

ants to channel secret rebates, allowances and discounts to franchisees through lower prices; (3) that which will eliminate the differences in prices extended to "company owned" stores and "chain stores" vis-a-vis Ben Franklin franchised stores; (4) that which will stop encroachment of company owned stores into the

claims for injunctive relief the plaintiffs' have continuously alleged that the acts and practices complained of were occurring at the time of the commencement of this action on April 7, 1972, and more importantly they contend that the franchise agreement and procedures of City Products must be changed in order to prevent continued injury to the class and to create a viable system in which Ben Franklin franchisees can operate their business. Except possibly for their "exclusive dealing" claim, the acts and practices of the defendants alleged to be in violation of the antitrust laws have continued according to plaintiffs, since the commencement of this civil action on April 7, 1972 to the present time.[22]

In view of plaintiffs' allegations that the complained of acts and practices of the defendants have continued to the present time, the Court finds it very difficult to understand plaintiffs' limitation of the claims for damages on behalf of themselves and the proposed class to the period of time ending on April 7, 1972. If, as plaintiffs have alleged, the "common" facts which form the basis of their antitrust claims have existed through the present time, then it would appear to be in the best interest of the class members to assert the claims for damages for that same time, unless of course there is some appropriate reason why damages for the entire period of time cannot be established. In this case, plaintiffs have in effect abandoned the damage claims on their own behalf and on behalf of potential class members for the period commencing on April 8, 1972 and ending at the time of trial of this case. Most importantly, the reason for that action has *not* been stated by them to be their

discovery that the previously asserted damage claims cannot be presented by or on behalf of the potential class members. Rather, the "simplification" of the claims for damages has been stated to be for the purpose of "enhancing the manageability of the class action" or to "evidence the manageability of the class action." This stated purpose for the abandonment of substantive damage claims of persons who are included in the class of persons which plaintiffs seek to represent under Rule 23, coupled with plaintiffs' allegations in support of the injunctive claims, raises fundamental questions concerning the ability and desire of the plaintiffs to protect the interests of the potential class members. There may, of course, be an acceptable explanation for the apparent inconsistency in the asserted claims for damages and injunctive relief. Plaintiffs may have not intended to express an intention to limit the proof of damages to the period ending on April 7, 1972, even though their proposed formula for damage computation on a class-wide basis is limited to that period of time. Or, the explanation may be that the injunctive claims are secondary to the damage claims and plaintiffs are not seriously contending with regard to all claims that the alleged illegal acts and practices of the defendants can be established to have continued on a basis subject to class action treatment substantially beyond the date of filing of the Class Action Complaint on April 7, 1972. Because the record in this cause leaves no doubt that plaintiffs intend to offer proof of damages to the class members only for the period of time prior to April 7, 1972, the Court deems the latter explanation to be more likely a reflection of plaintiffs' reasoning.[23] A third

---

territories of Ben Franklin franchisees; (5) that which would possibly require segregation of City Products and its subsidiary T. G. & Y. by divestiture; and (6) that which would prevent City Products from instituting franchise provisions or following practices which require franchisees to deal exclusively with City Products.

**22.** With regard to the "exclusive dealing" claim, plaintiffs' concede that the portion of the standard franchise agreement which formed the initial basis of this claim has been unilaterally deleted from the agreements by City Prod-

ucts. However, plaintiffs contend that there is a present "threat" that City Products may at a future time attempt to insert this provision into the franchise agreements, and thus they request injunctive relief with regard to that claim. See Section 16 of the Clayton Act, 15 U.S.C. § 26.

**23.** The Court has reached this conclusion partially on the basis of the evidence which plaintiffs have offered on the issues of commonality and typicality in their class action request. That evidence is notably deficient with respect

explanation which may be offered is that plaintiffs have subscribed to the theory that it is in the "best interest" of the class members to have only a portion of · their damage claims presented in a class action on their behalf rather than propose to present all of their claims in a class action which would be "unmanageable" and thus not maintainable.[24] The Court finds this proposition ˙ questionable in the context of the substantial damage claims in this case which under the federal antitrust statutes carry provisions for the recovery of treble damages and costs, including reasonable attorneys' fees, and in view of the possibility that class members may be precluded from presenting their remaining damage claims by reason of their being represented in this class action involving only a portion of their damage claims.[25] Furthermore, in view of

to matters subsequent to the year 1972, particularly in the areas of the activities and practices of the defendants. Additionally, plaintiffs have limited the composition of the class of persons they seek to represent to only those persons fitting their class definition during the years 1968 through 1972, notably not including persons who may have become Ben Franklin Franchisees since April 7, 1972, who would normally be included in the class of persons on claims for injunctive relief. Furthermore, the Court finds it difficult to believe that the plaintiffs would abandon their individual claims and the class claims for damages incurred subsequent to April 7, 1972, unless there was some reason to believe that liability could not be established on an individual basis or class wide basis for that period of time. Finally, the Court finds it difficult to believe that the defendants have not altered at least some of their practices regarding franchisees since the institution of this action, at least to the extent that whatever action they may have taken would be less susceptible to challenge through the class action device.

24. Plaintiffs have presented in support of their motion to maintain this action as a Rule 23 class action numerous contentions relating to the "size" or assets of the potential class members as compared to the "size" or assets of the named defendants. And, they have argued that the individual Ben Franklin franchisees without the benefit of a class designation cannot be expected to successfully prosecute their claims "involving complex antitrust issues against the huge City Products organization with its multimillion dollar profits and virtually unlimited litigation resources." In this context, plaintiffs' arguments equate the "size" or resources of the potential class members with the relative "size" or value of their potential antitrust claims, and with that assumption invoke the argument that the purpose of Rule 23 is to facilitate the presentation of comparatively inconsequential damage claims of individuals, and that if the class members' claims for damages are so small that no competent attorney would undertake complex antitrust litigation to recover so inconsequential an amount, economic reality dictates that the suit proceed as a class action or not at all. The defects in plaintiffs' argument are first that in the area of antitrust litigation the relative "size" or assets of a particular plaintiff does not necessarily equate with the value of that plaintiff's damage claim, and in fact the situation may be that a plaintiff is alleging that he is presently without assets due to the fact that the named defendant has through acts in violation of the antitrust laws deprived him of substantial assets. Secondly, the theory that in some circumstances "economic reality" dictates that claims be presented in a class action or not at all does not look to the assets of the particular plaintiffs or individual class members, but rather looks to the value of their potential damage claims. See *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 161, 94 S.Ct. 2140, 2144, 40 L.Ed.2d 732, 739 (1974).

In the context of the present matter, plaintiffs' "economic reality" argument is also unsupported by the evidence. There is no evidence before this Court which indicated the "size" or assets of either the named plaintiffs or the potential class members, and the evidence which plaintiffs have offered indicates that the potential damage claims are not inconsequential in the sense that no competent attorney would undertake complex antitrust litigation to recover them. With respect to the claim of merchandise tying alone, the evidence indicates that potential franchisees purchased a major amount of their merchandise from or through City Products and that the City Products markup on those purchases, alleged to be the measure of damages, was approximately 20%. Assuming the truth of plaintiffs' claims and allegations on behalf of the class members, the class members would have potential treble damages on their merchandise tying claim alone which would approximate 50% of their total purchases from or through City Products Corporation since 1968. The majority of the potential class members are alleged to have purchased 80% of their merchandise from or through City Products, and a relatively small franchise operation is classified as one which conducted an *annual* retail business of approximately $50,000.00.

25. The principle of *res judicata* does come into play in the litigation of claims in a class action under Rule 23(b)(3), F.R.Civ.P. See Rule 23(c), F.R.Civ.P. Although rarely discussed in the

plaintiffs' proposed methods for proof of damages, it appears unlikely that the mere broadening of the period of damages would lead them to believe that "unmanageability" would suddenly become an important factor.

■ Whatever the reasoning of plaintiffs in presenting their seemingly inconsistent claims for damages and injunctive relief on behalf of themselves and their proposed class of plaintiffs, the Court is unable at the present time to find that their proposed presentation of the damage claims is not in the best interest of the potential class of plaintiffs. As the damage claims are proposed to be presented under Rule 23(b)(3), that judgment must be left to those persons who may be declared members of the class which plaintiffs propose in the exercise of their choice to exclude themselves from or intervene in the action under Rule 23(c), F.R.Civ.P. However, plaintiffs' apparent inconsistency will be appropriately considered by the Court in connection with their motion to proceed on behalf of their defined class and subclasses with claims for injunctive relief under Rule 23(b)(1) and (2).

■ The third and final preliminary problem which has surfaced in connection with the consideration of plaintiffs' motion to proceed on behalf of their defined class and subclasses is the absence of evidence by plaintiffs to establish that the members of the subclasses can be identified. Although the defendants' evidence established that there presently are in existence records which can identify and establish the names of all present and former Ben Franklin franchisees who are members of the overall class as defined by plaintiffs, and there are records which disclose a current address for all current franchisees and some former addresses for former franchisees, there has been on plaintiffs' behalf a noticeable lack of effort to introduce evidence on the question of how it is to be determined which of these current and former franchisees are members of a proposed subclass.[26] The potential problem is best illustrated by a comparison of the class definition with the plaintiffs' class claims and some of plaintiffs' proposed defined subclasses.[27] The identification of those persons who are to be included in the proposed subclasses for portions of the "encroachment" claim, the "exclusive dealing" claim, the "secret rebates" claim and the "tying of merchandise" claim presents no problem as those subclasses as defined consist of either all current franchisees included in the overall class definition or of all franchisees included in the overall class definition who have purchased any amount of merchandise from

context of class actions the principle of *res judicata* and the operation of that principle to prevent a party from "splitting a cause of action" would most likely prevent class members who failed to opt-out of plaintiffs' proposed class action seeking injunctive relief from presenting the remaining portions of their damage claims in an individual action against the defendants named herein. See generally, 1b, Moore, *Federal Practice*, ¶ 0.410(2), pp. 1163–1184. (1975 ed.); see e. g. *International Telephone and Telegraph v. General Telephone & Electronics*, 369 F.Supp. 316 (D.C.N.C.1973).

26. In this context it should be pointed out that the problem presented is not with regard to ascertaining the names and at least some address for the class members to provide them with individual notice pursuant to Rule 23(c)(2). Although there are possibly several hundred potential class members who are not currently franchisees and do not have a current address on file with City Products Corporation, there is a former address for these franchisees which can be reasonably ascertained and there

is the possibility that as to those few class members whose addresses cannot be ascertained another form of notice, the best practicable under the circumstances, may be used. It is therefore anticipated that the notice requirements as outlined in *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) can be met in plaintiffs' proposed class action.

27. By definition plaintiffs' proposed overall class of plaintiffs includes all present and former franchisees who were party to the Ben Franklin Franchise Agreement and did business under the Ben Franklin name with four or fewer stores during the period April 7, 1968, through April 7, 1972. Plaintiffs' proposed subclasses are set up to include a portion of or all of these defined class members in one or more of the subclasses each of which presents a separate claim, so that plaintiffs do not propose to present claims on behalf of the defined class apart from subclass claims.

City Products during the period April 7, 1968, through April 7, 1972. However, with regard to the remaining subclasses, namely, those for portions of the "encroachment" claims, the "tying of premises" claim, the "tying of fixtures and signs" claim, the "tying of accounting" claim, and the "price discrimination" claim, inclusion in the subclass requires a factual determination with respect to each member in the overall class; namely, whether the class member subleased store premises, purchased fixtures or signs, subscribed to the accounting service, or "competed" with an allegedly favored store. Except indirectly with regard to the "price discrimination" claim, plaintiffs did not introduce evidence at the hearing on their class action motion which would form a basis for these determinations which will at some point be necessary in order to establish the identification of the members of the particular subclasses. Apparently, plaintiffs failed to elicit this precise information in their discovery on the class action issues and have operated under the assumption that the information can easily be obtained from the files and records maintained by the defendants. From the evidence offered by the defendants, the Court has concluded that with possibly one exception the files and records maintained by the defendants do disclose the basic information necessary for a determination of which of the potential class members meet the basic conditions for membership in each of the subclasses as defined by plaintiffs. It appears likely that upon further discovery from the named defendants, plaintiffs will be able to identify specifically the members of each of their proposed subclasses. It can be concluded therefore that the class and subclasses proposed by plaintiffs are sufficiently definite and the circumstances are such that the Court will be able to determine whether a particular individual is a member of the class or subclass. See 7,

Wright & Miller, Federal Practice and Procedure, § 1760, n. 96, pp. 579–584 (1972 ed.).

### B. Rule 23(a)(1) Numerosity

■ The parties have agreed and the evidence supports their agreement that insofar as the *overall class* as defined by plaintiffs is concerned the class is so numerous that joinder of all members is impracticable within the meaning of Rule 23(a)(1).

■■ Rule 23(c)(4) provides that a "class may be divided into subclasses" as plaintiffs have proposed herein. However, the Rule further provides that "each subclass [is to be] treated as a class, and the provisions of this rule shall then be construed accordingly." In this context, Rule 23 requires that the Rule 23(a)(1) requirement of numerosity also be met with respect to each of plaintiffs' proposed subclasses. In that regard, the only subclass which plaintiffs have failed to establish to be so numerous that joinder of all subclass members is impractical is that subclass composed of class members who have "competed" with either a "chain store" or with a "company owned" store "carrying either the 'Ben Franklin', T. G. & Y. or Scott name." As previously discussed, in the context of that subclass definition, plaintiffs have explained that the "competition" required for subclass membership will be shown by "market surveys", "merchandise surveys" and "set up statements" prepared by the defendants and which disclose "trade areas" of either franchised stores, "chain stores" or "company-owned" stores. Testimony concerning the contents of these documents was permitted by the Court in the evidentiary hearing on plaintiffs' class action request. That testimony established that approximately 22 franchisees met the requirements for inclusion in plaintiffs' price discrimination subclass by reason of their "competition" with one or more of the mentioned stores.[28]

**28.** The documents to which the testimony pertained were not offered in evidence in this proceeding. Plaintiffs' counsel were given the opportunity of reviewing those documents and offering them in evidence if it was believed that the testimony regarding their contents was in error. They have not presented the documents to the Court or relied on their contents in their proposed findings of fact on the numerosity issues. Thus, the Court has concluded that plaintiffs' counsel do not contest the accuracy of the testimony concerning their contents.

The Court has concluded that plaintiffs have failed to establish with respect to their subclass on the "price discrimination" claims that the subclass is so numerous that joinder of all members is "impracticable". The price discrimination claims asserted by plaintiffs on behalf of the proposed subclass of approximately 22 current and former franchisees are not alleged to be based on the terms of the standard franchise agreement, and do not appear to arise out of the same basic facts as the remainder of the claims asserted herein. In that respect, the price discrimination claims are distinct from the majority of the antitrust claims presented by plaintiffs. Plaintiffs have limited their definition of "competition" in such a manner that the membership in the subclass is determinable at the present time, and it does not appear impracticable to make all members of this relatively small group of franchisees parties to the claims of price discrimination.[29]

In seeking to maintain a class action or to represent a subclass the burden is upon the plaintiff to establish not only that the class or subclass is "numerous" within the meaning of Rule 23(a)(1) but also that joinder of all members is impracticable. The determination of these requirements is not dependent merely upon the number of class or subclass members, but also involves a consideration of the particular circumstances surrounding the proposed class or subclass. 3b Moore's *Federal Practice* ¶ 23.-05 (1975 ed.); see *Smith v. Board of Education*, 365 F.2d 770 (8th Cir. 1966); *Arkansas Ed. Ass'n v. Board of Education*, 446 F.2d 763 (8th Cir. 1971).

In the instant case, the evidence fails to establish that joinder is impracticable with respect to the proposed price discrimination subclass, and in fact establishes that because of the relatively small number of subclass members the ability to determine the members of the subclass under plaintiffs' theory, the feasibility of intervention, the potential amount of the damage claims and the probable existence of individual questions of fact on the price discrimination claims, joinder is practicable and preferable to the proposed action on behalf of the "price discrimination" subclass.[30]

### C. *Rule 23(a)(3) & (4) Typicality and Adequacy of Representation*

The Court does not subscribe to the theme that the "typicality" requirement of Rule 23(a) involves a preliminary determination of the desire of the potential class members to obtain the relief requested on their behalf. See, e. g., *Ihrke v. Northern States Power Company*, 459 F.2d 566 (8th Cir., 1972). Rather it is the opinion of the Court that the typicality requirement is in essence embodied in other provisions of Rule 23, and that it can best be discussed in connection with the requirement that the representative parties will fairly and adequately protect the interests of the class. 3b Moore's *Federal Practice*, ¶ 23.06–2, p. 23–325 (1975 ed.). In this connection, the Court will in this section of its memorandum determine if the interests of the representative parties are coextensive with the interests of the class, whether the interests of the class representatives are in any way

---

**29.** Plaintiffs have not made the fact of "competition" a precondition to membership in their "encroachment" claim even though that claim includes an alleged attempt to monopolize in violation of Section 2 of the Sherman Act. Moreover, the membership in the "encroachment" claim has not been limited by the potential use of "market surveys" or "merchandise surveys". Therefore, the Court has not considered the attempt to monopolize allegation in the "encroachment" claim as analogous to the price discrimination claim in terms of the number of potential class members.

**30.** The probable existence of individual questions of fact is discussed in this Memorandum, *infra*. In addition, it should be noted that the Court is not convinced that plaintiffs' limitation of their damage claims of the price discrimination claims to the period ending on April 7, 1972, is in the best interest of the proposed subclass with respect to that claim. The evidence does indicate that there are presently in existence and have been since April 7, 1972, stores alleged to have received discriminatory prices. It appears that some of these stores have been and presently are located in proximity to some Ben Franklin franchisees.

antagonistic to the interests of the class members, whether the plaintiffs and their attorneys desire to and are capable of conducting their proposed class litigation, and whether the representative parties are members of the class or subclass they seek to represent.

██ Initially, pursuant to the Court's finding concerning the status and activities of the proposed class members, it is necessary to point out that plaintiffs have failed to establish that those class representatives who did not appear personally or through their corporate representative at the evidentiary hearing in this cause are members of the class or subclasses they seek to represent. Furthermore, with respect to that category of class representatives, the evidence does not establish that they have interests which are coextensive with those of the proposed class or subclasses, and the Court does not find that they either desire to or are capable of conducting their proposed class litigation. These findings are based on the fact that the category of representative parties who failed to appear at the evidentiary hearing have not established for the period 1968–1972 that they did business under the name "Ben Franklin", were party to a Ben Franklin Franchise Agreement, and did not own five or more Ben Franklin franchised stores. And those parties did not establish for the period 1968–1972 the prerequisites necessary for their inclusion in any one of the subclasses proposed by plaintiffs. Additionally, this category of class representatives by their failure to appear at the evidentiary hearing, and by their failure to offer any evidence which would establish that they are aware of their responsibility as class representatives, including the responsibility to bear a proportionate share of the costs of notice to class members, cannot by this Court reasonably be found to be adequate representatives of a Rule 23(b), (c) class of persons on serious and substantial antitrust claims. Therefore, the Court finds and concludes that plaintiffs and proposed class representatives Gabel, Bell, Hallacy, Schwartz and Synnes Variety Store, Inc., have failed to establish that their claims are typical of the claims of the class within the meaning of Rule 23(a)(3) or that they will fairly and adequately protect the interests of the class within the meaning of Rule 23(a)(4).

██ The remaining six plaintiffs and proposed class representatives can be subdivided into two separate categories: those who are currently Ben Franklin Franchisees, Williams, Augusta Variety, Inc., Sites, and Cruse; and those who are former Ben Franklin franchisees, Chmieleski, and D. M. & D., Inc. The Court finds with respect to both categories that the individual plaintiffs genuinely desire to conduct their proposed class litigation, and that they are aware of their responsibility of bearing their pro-rata share of the expenses of litigation, including the costs of giving any required notice to the class members.[31] The Court further finds that counsel for these plaintiffs are qualified, and capable of conducting the proposed class action litigation. Thus far their representation has been of high quality and their prosecution of the class action vigorous. The Court has no reason to believe that it will not continue as such.

██ In view of the fact that plaintiffs desire to present class and subclass claims for both damages and injunctive relief, it is the opinion of the Court that the

---

**31.** Within these categories of plaintiffs are two corporations, D. M. & D., Inc., and Augusta Variety, Inc. The evidence with regard to these corporations and their ability to adequately protect the interests of the class was presented through the testimony of the majority shareholder of each of the corporations. The Court has examined the attitudes and capabilities of these individuals in determining that the corporations which they control desire to conduct the proposed class actions and realize their responsibilities. For the purposes of the class action determinations in this section of its memorandum the Court has treated each corporation and those individuals which control it as one. Should these corporations ultimately be declared an appropriate representative of any class or subclass, that declaration would be conditional on the corporate control remaining the same as at the time of that determination.

named former Ben Franklin franchisees, Chmieleski and D. M. & D., Inc., are not qualified to represent the proposed class and subclasses in all respects. These two plaintiffs who are proposing to act as class representatives are not members of any class or subclass in the requests for injunctive relief, and their interests are not coextensive with the interests of current franchisee members of the class insofar as the class claims for injunctive relief are concerned. Therefore, with respect to the class and subclass claims for injunctive relief on behalf of current franchisees, the Court finds that only plaintiffs Cruse, Sites, Augusta Variety, Inc., and Williams may have claims and interests coextensive with those current franchisees. These representative parties are members of the overall class of plaintiffs on the claims for injunctive relief and are members of the following subclasses with their injunctive claims: (1) Tying of Accounting—Williams, Sites and Augusta Variety, Inc.; (2) Tying of Premises—Sites and Augusta Variety, Inc.; (3) Tying of Fixtures or Signs—Sites, Cruse, and Augusta Variety, Inc.; (4) Tying of Merchandise —Williams, Sites, and Augusta Variety, Inc.; (5) Confidential Rebates—Cruse, Williams, Sites, and Augusta Variety, Inc.; (6) Price Discrimination, Encroachment and Exclusive Dealing—Cruse, Williams, Sites, and Augusta Variety, Inc. The evidence does not disclose that these plaintiffs have interests antagonistic to those of the class or of any subclass insofar as injunctive claims are concerned. It is the finding and conclusion of the Court that these plaintiffs and class representatives do have claims typical of the injunctive claims asserted on behalf of the subclass of which they are indicated above to be a member and that they will fairly and adequately protect the interests of the subclasses and class with regard to those claims for injunctive relief within the meaning of Rule 23(a)(3) and (4).

On the claims for damages which plaintiffs have asserted on behalf of the proposed class and subclasses, the Court has reached the conclusion that the named six plaintiffs, both current and former franchisees, are qualified to represent those class members who are members of the particular subclass of which the particular plaintiffs are also members. The evidence disclosed no interests either of current or former franchisees comprising this category of the named plaintiffs which are antagonistic to those members of the class or subclasses who may have claims for damages. The Court further finds that with respect to the class and subclass claims for damages, all six of the proposed class representatives in the defined category have damage claims coextensive with the interests and claims of the particular members of the subclass of which they are members. As to their damage claims, these six representative parties are all members of the overall class of plaintiffs and the following subclasses: (1) Tying of Accounting—Williams, Sites, Augusta Variety, Inc., Chmieleski, and D. M. & D., Inc.; (2) Tying of Premises—Sites, Augusta Variety, Inc., Chmieleski and D. M. & D., Inc.; (3) Tying of Fixtures or Signs—Sites, Cruse, Augusta Variety, Inc., and D. M. & D., Inc.; (4) Tying of Merchandise—Williams, Sites, Augusta Variety, Inc., Chmieleski, and D. M. & D., Inc.; (5) Confidential Rebates—Williams, Sites, Cruse, Augusta Variety, Inc., Chmieleski, and D. M. & D., Inc.; (6) Price Discrimination—Williams, Sites, Cruse, Augusta Variety, Inc., and D. M. & D., Inc. Therefore, within the meaning of Rule 23(a)(3) and (4) the Court finds and concludes that the representative parties do have damage claims typical of those damage claims asserted on behalf of the subclass of which they are indicated above to be a member, and that they will fairly and adequately protect the interests of the subclass and class with regard to those damage claims.

■ In reaching these determinations, the Court has rejected defendants' arguments that the class representatives as both current and former franchisees, cannot adequately represent the class and defined subclasses. Although the Court recognizes that some Courts have adopted this argument in denying class action certification in franchisee antitrust litigation, this Court deems the view expressed by Judge Becker

in the decision in *Ungar v. Dunkin Donuts of America, Inc.,* 68 F.R.D. 65 (E.D.Pa. 1975),[32] to be the better reasoned view on this subject. In the circumstances of the instant litigation, the most that can be said with regard to the former franchisee's interest vis-a-vis the claims of class members who are current franchisees for injunctive relief is that the former franchisees are not concerned with this particular aspect of the case. This Court does not view this situation as an antagonistic interest or conflict of interest, but rather views it as absence of coextensiveness of all of the claims of the class representatives and potential class members. In an action such as presented to this Court wherein the claims for damages asserted on behalf of both present and former franchisees constitute one of the primary objects of the suit, the solution to a potential problem concerning the coextensiveness of interest of current and former franchisees in injunctive claims is not a denial of the class suit on that basis but rather is a consideration of the myriad of possibilities presented by Rule 23(c)(4) and (d) for avoidance of any conflict which may arise. The flexibility in Rule 23 coupled with the ease with which plaintiffs' proposed subclasses could be subdivided to account for the differences in the claims of present and former franchisees, leaves this Court with little doubt that the "conflicts" which have been raised by defendants are more imaginary than real and can be easily remedied should they arise.[33]

## D. *Rule 23(b)(1) and (2) Class Actions*

Without discussion of the requirements of Rule 23(a)(2) concerning whether or not there are questions of law or fact common to the class and subclasses proposed by plaintiffs, the Court at this point finds it appropriate to discuss plaintiffs' request to proceed on behalf of their defined class and subclasses with their claims for injunctive relief in a class action under Subsections (b)(1) and (b)(2) of Rule 23.

An action may be maintained as a class action under Subsection (b)(1) of Rule 23,

---

**32.** *Reversed on other grounds,* Nos. 75–1625 and 75–1626, 531 F.2d 1211 (3rd Cir. 1976).

**33.** The Court has viewed the problem pointed out by the defendants primarily as one of a possible need for further subclasses, or a more precise definition of the subclasses and their representative parties. It should be pointed out that the findings and determinations regarding numerosity, identity of subclass members, the inconsistency of the class claims for damages and injunctive relief, and other matters previously discussed herein would not appear to be altered by that possible subdivision of six of plaintiffs' eight proposed subclasses. Should a class action be certified which includes all of the claims which plaintiffs have proposed to present on behalf of the overall class, and subdivision became necessary there would be, if the price discrimination claims were included, in fact eleven separate subclasses, two of which would present multiple claims and each of which would have a separate set of subclass representatives (with of course some plaintiffs being representatives in several separate subclasses). In general terms these eleven subclasses would be composed of *defined class members* in the following divisions: (1) Current franchisees presently subscribing to accounting (injunctive); (2) Former franchisees and current franchisees who had subscribed to accounting (damages); (3) Current franchisees who sublease premises (injunctive); (4) Former and current franchisees who have subleased premises (damages); (5) All current franchisees who have purchased fixtures and signs (injunctive); (6) Former and current franchisees who had purchased fixtures and signs (damages); (7) Current franchisees who have purchased merchandise (injunctive); (8) Former and current franchisees who have purchased merchandise (damages); (9) Current franchisees in the "trade area" of an allegedly favored store (injunctive); (10) Current and former franchisees who have been in the "trade area" of an allegedly favored store (damages); and (11) On the monopolization ("encroachment") claims and exclusive dealing claims all current franchisees. Subclasses for injunctive relief would be represented by only current franchisees who were members of the subclass, and those subclasses for damages would be represented by both current and former franchisees who were members of the subclass. Notably, the subclasses composed of persons who have purchased merchandise from City Products during the defined period in suit would present both the tying of merchandise claims and the confidential rebate claims.

Possible ethical considerations involved in plaintiffs' counsel's representation of all subclasses should, in the first instance be dealt with by counsel, and the Court will not attempt to speculate in that area.

F.R.Civ.P. if the prerequisites of subdivision (a) are satisfied, and in addition:

"The prosecution of separate actions by individual members of the class would create a risk of

"(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

"(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests, . . . ."

With regard to plaintiffs' claims on behalf of themselves and the defined class of plaintiffs under Rule 23(b)(1)(A) the Court will assume that there is a risk of separate actions if the class action is not permitted. It is the opinion of the Court that a class under Rule 23(b)(1)(A) is inappropriate, and because of the types of claims presented in this action, the prosecution of separate actions would not create a risk of the establishment of incompatible standards of conduct for the defendants. This conclusion is based primarily on the fact that plaintiffs' class claims are premised on the relationship which existed between each of the individual class members and the defendant City Products Corporation. There are numerous individual issues concerning these franchisees. Merely because there is a possibility that in individual suits some class members may establish their claims and others may not does not satisfy the requirements of Rule 23(b)(1). *Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124 (E.D.Pa.1973). Rather, in order for there to be a risk of varying adjudications, there must be different parties attempting to impose different standards of conduct upon the party or parties opposing the class. *Goldman v. First Nat. Bank of Chicago*, 56 F.R.D. 587 (N.D.Ill.1972). Plaintiffs have not introduced evidence to that effect in this proceeding and from the circumstances of this case such a situation appears highly unlikely. Furthermore, the defendants in this action, have vigorously opposed certification of a class under Rule 23(b)(1)(A) and thereby have declined the protection afforded to them by that provision of Rule 23.

The Court has arrived at a similar conclusion in connection with plaintiffs' request to proceed under Rule 23(b)(1)(B). That subsection of the Rule is not applicable to cases such as that presently before the Court, but rather is designed for situations wherein the class members have common rights or interests which should be adjudicated contemporaneously. *Rodriguez v. Family Publications Service, Inc.*, 57 F.R.D. 189 (C.D.Cal.1972); see 3b, Moore, *Federal Practice*, ¶ 23.35(2) (1973 ed.). The Court finds unpersuasive plaintiffs' argument that the principle of *stare decisis* as applied in antitrust litigation creates a risk that adjudications with respect to individual members would be dispositive of or substantially impair the interest of class members. Even less persuasive is their argument that this antitrust action is analogous to a suit concerning patent validity. The volume of evidence offered in connection with plaintiffs' motion to proceed with their claims under Rule 23 adequately reveals that plaintiffs' substantive antitrust claims do not merely present a question as to the facial legality of the standard form Ben Franklin franchise agreement under the antitrust laws. Rather plaintiffs' claims involve in depth examination of the activities of the defendants and the relationship between City Products Corporation and each of its franchisees wherein the standard agreement is only one factor. The plaintiffs herein are seeking to represent a large number of scattered individuals with various different antitrust claims for damages and injunctive relief. This situation does not present that which is required for class certification under Rule 23(b)(1)(B). See *National Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476 (S.D.N.Y.1973); *Bogosian v. Gulf Oil Corp., supra.*

For these reasons the Court has concluded that maintenance of the proposed class action and subclass actions under the provi-

**156**

sions of Rule 23(b)(1) is inappropriate and the motion before the Court in that particular respect will be denied.

An action may be maintained under Subsection (b)(2) of Rule 23 if the prerequisites of subdivision (a) are satisfied, and in addition:

> "The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . . ."

 Initially, the fact that plaintiffs seek to represent present and former franchisees, have eight proposed subclasses in their claims, and the fact that not all members of the overall class proposed by plaintiffs request injunctive relief on all subclass claims, makes it obvious that injunctive relief is not appropriate with respect to "the class as a whole" and makes it necessary to view plaintiffs' motion to proceed under Rule 23(b)(2) in the context of the proposed subclasses. Thus, the question is whether final injunctive relief or corresponding declaratory relief would be appropriate with respect to any of the *subclasses* as a whole, and whether any of the proposed subclasses meet the requirements necessary to proceed under Subsection (b)(2) with the claims for injunctive relief.

Insofar as plaintiffs proposed subclasses on their "tying" claims, "confidential rebates" claims and "price discrimination" claims are concerned, as the Court has previously indicated in its preliminary observations of plaintiffs' Rule 23 motion, the Court has concluded that the claims for injunctive relief are secondary to the damage claims asserted on behalf of those subclasses.[34] Taking into consideration the evidence and arguments presented by plaintiffs in connection with all of their claims for injunctive relief, including those for "exclusive dealing" and "encroachment", and the obvious economic realities involved in the prosecution of complex antitrust litigation, the Court is convinced that the primary focus of this litigation is to recover damages on behalf of the class representatives and the proposed class members. Notably, plaintiffs have not included in the class of persons whom they seek to represent those persons who may have become franchisees since April 7, 1972, the cut-off date for plaintiffs' class membership roll, even those persons would theoretically have the claims for injunctive relief presented on behalf of the current franchisees included in plaintiffs' class definition. Of further note is the fact that not one of the plaintiffs or proposed class members is alleged to have only claims for injunctive relief, and all are proposed members of a subclass on behalf of which damage claims are sought to be prosecuted. These facts have significant bearing upon plaintiffs' motion to proceed with their proposed class action under subdivision (b)(2) of Rule 23.

 This Court is in agreement with the principle that in antitrust cases in which damages under Section 4 of the Clayton Act are a significant element in plaintiffs' class action claims and in which final relief relates predominately to damages, certification under Rule 23(b)(2) is inappropriate. See 3b Moore, *Federal Practice*, ¶ 23.40, p. 23–654 (1974 ed.); *Ungar v. Dunkin Donuts of America, Inc., supra.*[35] Therefore, with regard to those subclasses wherein plaintiffs seek to proceed under subsection (b)(2) with the claims designated as the "tying claims" the "confidential rebate" claims, and the "price discrimination" claims for injunctive relief, the Court has concluded that maintenance of those subclass actions is inappropriate under Rule 23(b)(2).

Plaintiffs seek only injunctive relief with their claims on behalf of the proposed subclasses designated as the "encroachment" claims and "exclusive dealing" claims.

 The injunctive relief which plaintiffs seek on behalf of the overall class and in particular on behalf of these two

---

**34.** See, p. 147, *supra.*

**35.** *Reversed on other grounds,* Nos. 75–1625 and 75–1626, 531 F.2d 1211 (3rd Cir., 1976).

designated subclasses is pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. That section invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue to occur. *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). However, the private litigant does not stand as an enforcer of public rights and in order to obtain injunctive relief under Section 16 of the Clayton Act he must demonstrate threatened injury of a personal nature proximately resulting from the antitrust violation. *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.*, 369 F.Supp. 316 (D.C. N.C.1973); see *Jeffrey v. Southwestern Bell Telephone Co.*, 518 F.2d 1129 (5th Cir. 1975). In the context of Rule 23(b)(2) therefore, in order to maintain a class action for injunctive relief under Section 16 of the Clayton Act, the class representatives must establish in addition to the Rule 23(a) requirements, first that the defendants have acted or refused to act on grounds *generally applicable* to the class, and second that the defendants' alleged action or inaction, if established, threatens all of the class members with serious loss or injury, thereby making it probable that final injunctive relief with respect to the class as a whole will be appropriate under Section 16 of the Clayton Act. Whether the requirement of a showing of the probability of a threatened serious loss or injury to *all* of the class members is viewed as a requirement to establish common questions of fact under subsection (a)(3) of Rule 23, or as a requirement which is inherent to a finding that final injunctive relief under Section 16 of the Clayton Act is appropriate with respect to the class as a whole, the test is the same. In order to maintain a Rule 23(b)(2) class action for injunctive relief under Section 16 of the Clayton Act, the class representative must convince the Court that the alleged action of the defendants which forms the basis of the class action antitrust claims, if established to be true, would in probability show threatened, personal, direct, and serious loss or injury to *all* of the class members thereby making appropriate final injunctive relief under Section 16 of the Clayton Act with respect to the class as a whole. If it appears to the Court that plaintiffs' antitrust claims if established would not establish such personal threatened injury to all or substantially all of the class members thereby making appropriate under Section 16 of the Clayton Act injunctive relief to the class as a whole, a class action under subsection (b)(2) is inappropriate. That determination requires an overview of the disparities between the individual class members. See, e. g., *National Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476, at 492 (S.D.N.Y.1973).

In the context of plaintiffs' "encroachment" or monopolization claim, the application of the above principles dictates that a Rule 23(b)(2) class action on behalf of the proposed subclasses for which those claims are sought to be presented is inappropriate. Plaintiffs have asserted on behalf of the entire subclass "encroachment" claims, or claims that the defendants have conspired to restrain trade, or monopolized and attempted to monopolize the "variety store" industry and to replace subclass members' "small"[36] franchised stores with "company owned" Ben Franklin or T. G. & Y. stores. It appears highly unlikely, in view of plaintiffs' evidence and allegations, that plaintiffs' claims if true would establish a threatened and serious loss or injury to all or substantially all of the members of their proposed subclass. Plaintiffs claim threatened injury to only a portion of the subclass members; namely those who currently own "small" Ben Franklin stores. That category clearly does not encompass all or substantially all of the members of plaintiffs' proposed subclass. Furthermore, with regard to the claims of plaintiffs that defendants have attempted to monopolize in violation of Section 2 of the Sherman Act, the plaintiffs have defined the relevant

---

**36.** "Small" is contended to be stores of less than $150,000.00 annual sales.

geographic market as one which is essentially local in nature, thus making it more unlikely with regard to that claim that injunctive relief will be appropriate for the subclass us a whole. In summary, assuming that plaintiffs can establish on behalf of their defined subclass those matters which they allege and contend with respect to their "encroachment" or monopolization claims, it is the opinion of the Court in view of the evidence adduced that it is extremely unlikely that appropriate final injunctive relief under Section 16 of the Clayton Act will be appropriate with respect to the subclass as a whole. Accordingly the motion to proceed on behalf of that "subclass" under Rule 23(b)(2) will be denied.

 With regard to the subclass claims denominated as the "exclusive dealing" claims, the evidence establishes that the defendant City Products has acted on grounds generally applicable to the subclass. These actions consist primarily of the insertion of paragraph 11(c) into the standard form franchise agreement and the letter to all franchisees on April 7, 1972, purporting to delete a portion of that paragraph. Plaintiffs allege essentially that defendant City Products has imposed an exclusive service requirement which is an unreasonable restraint of trade, and seek pursuant to Section 16 of the Clayton Act an order enjoining City Products from terminating any franchise agreement merely because the franchisee acquires an interest either directly or indirectly in any variety store except one operated under a Ben Franklin franchise.

As to whether final injunctive relief or correspondingly declaratory relief with respect to the subclass as a whole is likely to be appropriate in connection with the "exclusive dealing" claim, it is the opinion of the Court in view of the evidence adduced that any injunctive relief which is granted on this claim will likely be appropriate with respect to the subclass as a whole. Assuming the truth of plaintiffs' allegations on behalf of this subclass that there presently

exists a significant danger that the terms of paragraph 11(c) may be enforced in violation of the antitrust laws, and that the alleged violation is likely to continue, it is the conclusion of the Court that if plaintiffs can satisfy the requirements of Rule 23(a)(3) with respect to that subclass claim, maintenance of a Rule 23(b)(2) action on behalf of the subclass proposed would be appropriate.[37]

### E. *Rule 23(b)(3) Class Action Issues*

In light of the Court's determination of the motion of the plaintiffs to proceed on behalf of the defined class and subclasses with claims for damages and injunctive relief under Subsections (b)(1) and (b)(2) of Rule 23, F.R.Civ.P., it is apparent that the determinative issues in this proceeding are those presented by Subsection (b)(3) of the Rule. As the questions of law and fact encompassed by each of the substantive claims presented on behalf of plaintiffs' defined class differ, the Rule 23(b)(3) determinations will be made with respect to each separate substantive claim. And, because the commonality requirement of Rule 23(a)(3) is encompassed by the requirements of Rule 23(b)(3), the Court's determinations in this section of its memorandum will also be applicable to the Rule 23(a)(3) issues.

An action may be maintained as a class action under Rule 23(b)(3) if the prerequisites of Subdivision (a) are satisfied, and in addition:

"The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the

37. The issue of whether there are questions of law or fact, common to this subclass will be

discussed under the Rule 23(b)(3) requirements *infra.*

class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

As stated in the Notes of the Advisory Committee to the present version of Rule 23:

"Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

\* \* \* \* \* \*

"Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. See *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801, [83 S.Ct. 13, 9 L.Ed.2d 46] (1963); cf. *Weeks v. Bareco Oil Co.*, 125 F.2d 84 (7th Cir. 1941); *Kainz v. Anheuser-Busch, Inc.*, 194 F.2d 737 (7th Cir. 1952); *Hess v. Anderson, Clayton & Co.*, 20 F.R.D. 466 (S.D.Calif.1957)."

 The finding of the Court that questions of law or fact common to the class sought to be represented "predominate" over questions affecting only individual members and that the class action is superior to other available methods of adjudication, is the basic prerequisite to the maintenance of a subsection (b)(3) class action. In deciding this dual issue the Court should consider *all* issues of law and fact which are reasonably likely to arise in the adjudication of the particular controversy between the parties, and in light of those considerations weigh the significance of the common questions and evaluate whether a class action would achieve economies of time, effort and expense and promote uniformity of results without sacrificing procedural fairness or bringing about other undesirable results. See, *Partain v. First National Bank*, 59 F.R.D. 56 (M.D.Ala.1973). If, following this process, it is determined that common questions predominate so as

to make the class action superior, the potential class action must then be evaluated to determine if it is desirable in view of the factors set forth in (A) through (D) of subsection (b)(3), including the determination of whether or not the action is realistically capable of being managed by the judicial system. *In Re Transit Tire Antitrust Litigation*, 67 F.R.D. 59 (W.D.Mo.1975). In the event one or more of these latter determinations dictate against the class action as proposed, consideration may be given to the appropriateness of subclasses or other methods of curing the particular undesirable aspect of the proposed class action under subsections (c) and (d) of Rule 23.

In a class action of the nature which is proposed by plaintiffs herein, the burden on the Court in making the appropriate determinations is tremendous. In addition to considering (1) policies encouraging private enforcement of the federal antitrust laws, (2) the argument that class members either cannot or will not bring individual actions to vindicate their rights, (3) the burden placed on the parties by a class action certification should the claims later be determined to be inappropriate for class treatment, and (4) the duty on the Court to assure that the interests of in excess of 1,000 individual businessmen will be adequately protected in the event a class action as proposed is permitted, this Court must analyze the substantive claims and defenses of the parties and attempt to anticipate the issues of law and fact which will surface as this litigation proceeds through trial and it must weigh those issues to determine which of them are likely to be "predominate", so as to make this proposed class action "superior" to other methods of adjudication. All of these considerations and determinations must be made under the only workable rule of law applicable; that which states that they "turn on the circumstances of the particular case".

### 1. Matters Applicable to all Subclass Claims

Prior to the Court's determinations with respect to each of the claims presented on behalf of the defined class and subclasses

several matters which are generally applicable to the majority of the claims will be discussed.

### a. Statute of Limitations

Initially, it should be pointed out that plaintiffs have failed to propose a subclass for the presentation of their "confidential rebates" claims for damages for the period of time prior to April 7, 1968. Although, in view of plaintiffs' arguments and evidence, this may have been an oversight, the Court has deemed these damage claims to have been abandoned and no longer asserted on behalf of the overall class of plaintiffs. Therefore, this litigation does not present claims for damages which occurred more than four years prior to the date of filing of the class action complaint and does not present individual questions of fraudulent concealment and the tolling of the statute of limitations as to plaintiffs and class members.[38]

### b. Proof of Damages

█ A frequently discussed issue in decisions relating to the "predominance" and "superiority" questions in civil antitrust actions for damages sought to be maintained under Rule 23(b)(3) is that concerning the question of proof of damages. See 3b Moore, *Federal Practice*, ¶ 23.45(2), p. 23–754 (1974 ed.). Although the majority of Courts do not question the fact that the amount of damages a particular class member will recover is an issue of fact which is individual to each class member, the consequences of the presence of these individual issues in the determination may vary. Compare *Ungar v. Dunkin' Donuts, Inc., supra* to *City of Philadelphia v. American Oil Co.*, 53 F.R.D. 45 (D.N.J.1971). This Court does not subscribe to the view that merely because the issue of damages may be severable from the issue of liability and tried through the vehicle of separate damage proceedings, the presence of that individual issue in the class action should not be weighed in determining whether a class action should be maintained. Nor does this Court subscribe to the view that the mere fact that the issue of damages is an individual issue renders a class action under Rule 23(b)(3) inappropriate. Rather, the amount of damages, if any, to be recovered by the individual class members, being an individual issue of fact, should be weighed with the other issues in the case, both common and individual, to determine predominance and to determine if a class action is superior. In that process questions such as whether or not proof of damages can be severed from the issues of injury and liability, and whether or not damages can be established by evidence common to the class become pertinent but not necessarily determinative. See, *In Re Transit Tire Antitrust Litigation*, 67 F.R.D. 59 (W.D.Mo.1975).

In the instant case plaintiffs have in recognition of the individual issues presented by the claims for damages sought to be maintained on behalf of the class members attempted to establish that damages for the entire class of plaintiffs and for each individual class member on all subclass claims can be established by mathematical computations of data which can be obtained from non-parties and the files and records of the defendants, thus obviating the necessity of the appearance of each class member. In this manner plaintiffs have attempted to escape the problems of manageability which might accompany severance of the damage claims and separate individual trials thereon, and they have sought to lessen the impact of these individual issues on the quantative amount of time and attention required to conclude those individual mat-

---

**38.** The Court views the issue of fraudulent concealment as an individual issue of fact which involves evidence as to the state of mind of particular class members. Thus, if plaintiffs' failure to designate a subclass on behalf of which it desires to present pre-1968 damage claims for alleged rebates in violation of the antitrust laws was an oversight and they would later seek leave to reassert those claims on behalf of a proposed subclass, that individual issue would be applicable to only the claims presented on behalf of that subclass. The Court's observations with respect to plaintiffs' method of proof of damages on those pre-1968 claims indicate the probable outcome of a request to reinstate these pre-1968 damage claims.

ters.. In this argument, plaintiffs have not proposed that the issues of liability and damages can or should be severed for individual damage trials, although their proposal does not absolutely foreclose that possibility.

The Court has examined plaintiffs' proposed theories and methods of proof offered in connection with their assertion that damages to the individual class members can be established by evidence obtainable from non-parties and the defendants. This examination has *not* been to determine whether or not plaintiffs' proposed damage proof would if carried forward meet the substantive requirements of proof of damages in antitrust cases. Rather, the Court has examined the proposed methods of proof to determine the likelihood of its application in the context of this particular litigation and to determine the consideration which will be given to the individual damage issues.

In view of the evidence which has been adduced in support of and in opposition to the applicability of plaintiffs' methods of damage proof in the context of this litigation, the Court has concluded that it is unlikely that plaintiffs can obtain from the defendants and non-parties that data and evidence necessary for the implementation of their proposed methods and procedures for proof of damages on all of the various claims asserted on behalf of the class members. The basis for this conclusion is as follows.

Plaintiffs' method of proof of damages on behalf of the individual class members involves both individualized proof of damages on the "tying of premises", and "tying of fixtures and signs" claims, and on the remaining claims a method involving proof of total damages to the entire subclass for a particular claim and a distribution of that total to the individual subclass members on a pro-rata basis. The specific procedures to be followed in the implementation of the methods in connection with the damage claims sought to be presented on behalf of each of the defined subclasses was introduced in evidence through the testimony of plaintiffs' expert witness, Richard Greenberg, a certified public accountant. In the presentation of the methods of proof and the procedures to be followed, plaintiffs' expert included as an essential element to the implementation of his methods the availability of data reflecting specific activities of the defendants and individual subclass members. It is that data which forms the foundation of plaintiffs' proposed methods for proof of the measure of damages and their proposed methods for allocation of damages to the individual members of their subclasses. Included in this foundation data are records which show for the period of April, 1968 through April, 1972: (1) the amount individual class members paid for accounting services; (2) the number of accounting entries required by class members' stores selected for a statistical sample; (3) the identity of class members who subscribed to the accounting service, and the size of the store operated by the class member; (4) the amount of rent paid by class members who subleased premises from City Products; (5) the amount of rent paid by City products on subleased store premises; (6) the amount individual class members paid for fixtures and signs, and the identity of the fixtures and signs which they purchased; (7) the description of the items of merchandise sold by the Ben Franklin Division; (8) the quantities sold and the price at which items selected for a statistical sample of possibly 300 items were sold to class members generally; (9) the total amount of purchases of merchandise from City Products by each individual class member for the period 1968–1972 (and possibly for the period 1960–1968); (10) the total amount of "confidential" rebates received from suppliers by City Products; (11) the average mark-up between City Products' cost and selling price to company owned Ben Franklin stores and Scott stores supplied by the Ben Franklin Division (somewhere between 2% and 5%); (12) the cost to City Products of merchandise sold to class members' stores; (13) the average mark-up between City Product's cost and selling price to class members' stores; (14) the total amount of sales to all franchised stores; (15) the price

at which T. G. & Y. transferred or sold merchandise to its stores, and the average mark-up between T. G. & Y. cost and sale or transfer price to its stores; and (16) the percentage discount given to "chain stores" located in the "trade area" of a class member's store.

The question presented by plaintiffs' theory and argument in support of their motion to proceed on behalf of the defined class and subclasses is not whether this enumerated data is available from any source, and the Court will assume that it is available from multiple sources. Plaintiffs' contention in support of their class action motion is that all of the data enumerated above is available from the files and records of the defendants and that the application of their theory will not require the individual class members to provide evidence pertaining to their individual claims of damages. Therefore, in the context of the Rule 23(b)(3) issues before the Court the question becomes whether the plaintiffs' assertion that all of the enumerated data is available from the files and records of defendants is factually accurate.

In the presentation of his method of proof and procedure to be followed, plaintiffs' expert witness testified that he had generally reviewed the plaintiffs' discovery relating to the existence of documents, had generally reviewed the accounting procedures utilized by the defendants, and had given consideration to the types of documents maintained by the defendants. He concluded that the data necessary to implement his proposed methods was available from the defendants. Other than the conclusional testimony of their expert witness, plaintiff did not adduce evidence to establish the asserted fact that the defendants possessed all of the required data. In response to the testimony offered by plaintiffs' witness, defendants adduced evidence relating to the nonavailability from their files and records of a portion of the mentioned data. The Court finds the defendants' evidence which was based on a detailed and thorough examination of the files and records of the defendants to be more credible and convincing than that offered through the general conclusions and assumptions of plaintiffs' expert witness.

Defendants' evidence establishes that the following data is not available from the files and records of the defendants: (1) the amount individual class members paid for accounting services during the years 1968, 1969, and 1970; (2) the precise identity of all class members who subscribed to the accounting service for the years 1968, 1969, and 1970; (3) complete records showing the identity of and the amount paid for signs and fixtures by individual class members during the years 1968 and 1969; (4) the quantity of stock merchandise items sold during the years 1968, 1969, and 1970; (5) the complete records of the quantity of factory merchandise items sold during the years 1968 and 1969, and (6) complete records of individual franchisee purchases for the years 1960 through 1967. Additionally, the evidence viewed in its entirety indicates that it is extremely unlikely that the files and records of the defendants contain data which could be used to compute for the period of April 7, 1968 through April 7, 1972, the quantity of items of merchandise sold by City Products Corporation at a particular price at any particular time.[39]

In this proceeding, plaintiffs have the burden of establishing to the satisfac-

---

**39.** Plaintiffs' expert in discussing proof of damages on the merchandise tying claim, although not indicating so in the initial explanation of his methods, did indicate later in his testimony on cross-examination that in order to select the statistical sample of items for use in his proposed method of proof, the "frequency of sale" or quantity of the particular item sold during the sample period would be data required. He further indicated that, in order to be representative, the comparison of the price of items within the statistical sample to the price which the plaintiffs would obtain from vendors would necessarily have to include the entire period of April, 1968 to April, 1972. However, plaintiffs' expert was unable to relate the method which would be employed to make the required comparison for the entire period in view of his testimony that the comparison must be made in the same time frame, and in view of the fact that prices of items may have fluctuated during the period of time from 1968 through 1972. In

tion of the Court that common issues of fact predominate over individual issues. See generally 3b Moore, *Federal Practice*, ¶ 23.02(2), pp. 23–151 to 23–157 (1974 ed.). In that context, the burden is on the plaintiffs to establish that which they contend; namely, that individual proof of damages on their antitrust claims can be accomplished on a class-wide basis utilizing data obtained from non-parties and the files of the defendants.

The evidence presented herein fails to establish that plaintiffs will likely be able to obtain from non-parties and the files of the defendants that data necessary for the application of their proposed methods for class-wide proof of damages of the following subclass claims for the following years: (1) the "tying of accounting" claim for the years 1968, 1969, and 1970; (2) the "tying of fixtures" claim for the years 1968 and 1969;

(3) the "tying of merchandise" claim for the years 1968 through 1972; and (4) the "confidential rebates" claim for the years 1960 through 1967. Therefore, the Court concludes with respect to those claims that the proof of the amount of damages to be recovered by the subclass members will likely involve the appearance and testimony of individual subclass members.

In connection with plaintiffs' proposed methods of proof of damages on behalf of individual class members on the claims designated as the "tying of premises" claim, the "confidential rebates" claim for the years 1968 through 1972, and the "price discrimination" claim, the Court finds that plaintiffs have satisfied their initial burden and that it is likely that the methods proposed for damage proof of these claims can be implemented without the necessity of appearance and testimony by individual class members.[40]

this context, it would appear to be necessary to plaintiffs' proposed method for damage computation on the tying of merchandise claim that records be available which would establish the frequency of sale or the quantity of each item sold, and which would show the price at which items were sold at a particular time. The Court does not intend to intimate that substantive proof of damages in antitrust cases requires precise comparisons of price in an exact time frame, or to intimate that plaintiffs' method is not capable of meeting substantive requirements. However, plaintiffs' expert has indicated that data relating to frequency of sale and price fluctuation is a necessary element of his proposed method, and therefore it is important that the information is not available from the files and records of the defendants.

**40.** The Court deems it appropriate to discuss the price discrimination claim in this section of its Memorandum, even though it has been determined to be inappropriate for class action certification for failure to meet the requirements of Rule 23(a)(1). In discussing plaintiffs' proposed method for damage proof on the price discrimination claim plaintiffs' expert appeared to be unsure of the precise method which would be employed, particularly with respect to the claim relating to competition with company-owned Ben Franklin stores and Scott Stores. Insofar as his calculations relating to franchised class members' stores are concerned, plaintiffs' expert indicated that it would be necessary to determine the cost of merchandise to City Products Corporation which was sold to class members' stores. He stated that

this cost would be computed by reducing sales to the franchised stores by a figure termed "the average markup taken by City Products on merchandise" sold to franchised stores. The evidence establishes that records reflecting total sales to franchisees are available from City Products Corporation. However, the testimony of the plaintiffs' expert failed to indicate where the data termed "average markup" would be obtained. It would appear to be fundamental that in order to determine markup or "average markup" it would be necessary to have as essential parts to the calculation cost and selling price, and that if cost is available to make the calculation then it would not be necessary to reduce sales by "average markup" to arrive at data reflecting cost. As the Court views plaintiffs' expert's explanation he implies that data reflecting costs is unavailable, and at the same time implies that a figure—average markup—which necessarily includes cost data in its determination is available. Assuming *arguendo* that cost data for particular items at particular times is available from the files and records of City Products, and further assuming that data reflecting the price items were sold to franchisees at particular times is available, it would appear that "average markup" could be computed and that the cost of the total merchandise sold to franchisees during the years 1968 through 1972 could be ascertained. Walter Busch, presently Sr. Vice President of the Ben Franklin Division of City Products, offered the testimony which indicated that at least in summary form the cost and sale data was available from the files of City Products.

### 2. Questions of Law and Fact Presented by the Tying Claims

Because all of the claims which are presented in connection with plaintiffs' allegations that defendant City Products has in violation of Section 1 of the Sherman Act required class members to purchase goods and services from or through City Products as a condition to maintaining the "Ben Franklin" franchise involve the same alleged "tying item" it is apparent that the following questions of law and fact are common to the members of the class and subclasses on behalf of which the tying claims are presented: (1) the question of whether the alleged "tying item" and "tied items" are separate and distinct items; (2) whether City Products Corporation has sufficient economic power in the alleged "tying item", the "Ben Franklin" trademark, service mark, and franchise agreement to appreciably restrain competition in the market for each of the alleged "tied items"; and (3) whether a "not insubstantial amount" of interstate commerce is affected by each of the alleged tying arrangements.

#### a. The Existence of the Tying Arrangement

These questions, of course, are not the sole questions which are involved in the claims which plaintiffs have designated their "tying claims". Fundamental to the presentation of a claim of the existence of an illegal tying arrangement is evidence of the tying arrangement itself, generally defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agree that he will not purchase that product from any other supplier." See *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1968); *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

■ Due to the fact that a tying arrangement in violation of the federal anti-

trust laws involves the existence of the arrangement or "agreement" between the particular victim and the defendant, those claims necessarily present an issue of fact which is individual to each of the persons who is claiming to have been subjected to such an arrangement; that is the existence of the arrangement or agreement between the plaintiff and the defendant. Plaintiffs have in the instant litigation recognized that the existence of a tying arrangement between the individual class members and the defendant City Products is an issue of fact which is individual to each class member. However, they assert that these individual questions of fact will be established by evidence which is applicable to all class members or "common" to the class, and that therefore these tying claims are appropriate for class presentation under Rule 23(b)(3). Plaintiffs' argument is drawn primarily from the decisions in *Siegel v. Chicken Delight, Inc.*, 271 F.Supp. 722 (N.D.Cal. 1967) and *Ungar v. Dunkin' Donuts, Inc., supra*, and plaintiffs do not therefore contend that the questions of the existence of individual tying arrangements are truly "common" to the class members, in the sense that the issue of the presence of economic power is common, but rather contend that the existence of the individual tying arrangements can be established by evidence which is applicable to all class members.

In the area of the Rule 23 determinations of predominance and superiority in class actions asserting illegal tying arrangements, the decisions have in an attempt to delineate the issues of fact which are likely to arise in the proof of the existence of the individual tying arrangements engaged in discussions of that proof which is *required* for the establishment of an unlawful tying arrangement. See, e. g., *Ungar v. Dunkin' Donuts, Inc., supra*. This Court does not deem it necessary at this time to express its view of the nature of evidence which it would deem to be sufficient to establish a submissible case on the various tying claims

---

Therefore, the Court finds that it is likely that plaintiffs' proposed methods of proof on the price discrimination claims could be applied

without the necessity of proof by individual class members.

which the plaintiffs have asserted herein on behalf of themselves and their proposed subclasses, or to speculate on the jury instructions which might be appropriate in light of that evidence. The mere abstract possibility of the utilization of a method of proof involving the use of evidence common to the class members to establish the existence of a tying arrangement does not establish the likelihood that such proof will be the method employed in the presentation of the claims in this litigation, nor does it preclude the use of evidence which is individual to the class members in the presentation of or the defense of those claims. For this reason the Court deems the most appropriate analysis to be that which will disclose those methods of proof which are most likely to be employed in this litigation to establish the existence of the alleged individual tying arrangements on behalf of the class members and the nature of the evidence which is most likely to be offered by the defendants in opposition thereto.

### (1) *Tying of Accounting*

It appears most likely that plaintiffs' proof of the existence of the alleged tying arrangement with regard to the Ben Franklin Accounting Service will consist primarily of the terms of paragraph 6(a) of the standard Ben Franklin Franchise Agreement and evidence relating to the policies and practices which have been promulgated by City Products in connection with the sale of the accounting service to franchisees.[41] This evidence is in the opinion of the Court applicable to all members of the subclass on behalf of whom the tying of accounting claim is asserted, and the Court deems it unlikely that plaintiffs will attempt to ad-

duce individual evidence from subclass members to further establish the existence of the alleged tying arrangement.

The Court deems it unlikely that the defendants will attempt to limit their evidence relating to their alleged nonexistence of the tying arrangements between individual subclass members and City Products Corporation to that which is applicable to all subclass members. The evidence presented in the instant proceeding establishes that although virtually all class members executed a franchise agreement containing paragraph 6(a) and were generally subject to the policies and practices of City Products, they did not all subscribe to the Ben Franklin Accounting Service. It is clearly the position of City Products Corporation that it did not enforce any provision of paragraph 6(a) which might be implied to require franchisees to subscribe to accounting services and that its practices and procedures were not applied to franchisees on a broad or similar basis. Thus, it is asserted that evidence relating to the individual subclass members will establish that City Products did not use any economic power it may have possessed and did not "coerce", "persuade" or "influence" any individual franchisee to subscribe to its accounting service. The partial answer to defendants' argument is that those class members who did *not* subscribe to the accounting service, for whatever reason, are not members of the subclass asserting the tying of accounting claim and the fact that they were not party to any alleged illegal tying agreement does not negate the provisions of paragraph 6(a) of the standard agreement as they may pertain to those class members who did subscribe to the agreement. Although City

---

41. Paragraph 6(a) provides:

. "Owner agrees to use the standard Ben Franklin accounting records, or records providing similar information, as approved by Distributor.

"a. Where a store becomes newly franchised hereunder the Owner covenants and agrees to immediately execute the Distributor's regular form contract for the Ben Franklin Mail Accounting Program.

"b. If this franchise is issued to an Owner of an existing Ben Franklin Store and if own-

er is not currently using the Ben Franklin Mail Accounting Program, Owner hereby covenants and agrees to furnish Distributor on or before the 20th day of each month, the total gross sales for the preceding month during each year of the term of this franchise. Owner further covenants and agrees to furnish Distributor each month, the amount of his ending inventory at sell, if available."

Products may attempt to adduce from those class members who did subscribe to the service evidence that they did so voluntarily and not because of any agreement with City Products, the Court deems it likely that the primary defenses to be presented will pertain to matters common to the members of the class asserting the tying of accounting claims and that City Products will not adduce a large amount of evidence pertaining to the existence of an arrangement or agreement between City Products and individual class members concerning accounting.

### (2) *Tying of Premises*

With regard to the presentation of evidence to establish that the members of the subclass asserting the claim that City Products illegally tied store premises to its trademark, service mark and franchise agreement were each party to a tying arrangement to that effect, it is anticipated that plaintiffs will offer proof consisting of paragraph 11(c) of the standard Ben Franklin Franchise Agreement and the policies and practices of the defendant City Products in the area of store premises leasing.[42] Due to the language of paragraph 11(c), the Court deems it likely that the plaintiffs will attempt to adduce from individual subclass members evidence relating to the existence of individual tying arrangements or the individual enforcement of the alleged practices and procedures. Furthermore, in view of the language of paragraph 11(c), and because the evidence indicates that a majority of the overall class members did not sublease their store premises from City Products Corporation, the Court deems it extremely likely that the defendants will direct their proof as to the nonexistence of a tying arrangement to the particular situation of the individual subclass members. It is likely that the defendant City Products will attempt to establish that the individual subclass members were not required to sublease their store premises from City Products and that they did not feel "coerced," "persuaded" or "influenced" by City Products Corporation to do so. Additionally, it is anticipated that City Products will on an individual store basis introduce evidence relating to the store premise owner's requirements and the background of the use of the building to establish an independent reason for the City Products sublease.

### (3) *Tying of Fixtures and Signs*

Plaintiffs' proof of the existence of the alleged tying arrangement involving store fixtures and signs is not based on any specific terms in the standard Ben Franklin Franchise agreement. Although plaintiffs have not been specific in this area, it appears likely that their proof on behalf of the subclass members who are asserting this claim will consist of that relating to the policy of City Products Corporation and the enforcement of that policy with regard to the individual franchisees. Secondarily, plaintiffs may adduce proof relating to the "acceptance of the tie" or the amount of fixtures and signs purchased by subclass members. The Court deems it extremely unlikely that plaintiffs' proof of the existence of individual tying arrangements on behalf of the subclass members will be limited to evidence applicable to the subclass as a whole. Rather, on the basis of the evidence adduced in this proceeding, it is anticipated that plaintiffs will attempt to obtain and offer evidence relating to the individual subclass members in order to establish the existence of a tying arrangement and the enforcement of the alleged policies of City Products. Additionally, it appears likely that defendants will seek to obtain and adduce evidence which is related to the individual relationship between City Products and subclass members who have purchased fixtures and signs from or

---

**42.** Paragraph 11(c) provides:

"Distributor may, at its option, cancel and terminate this franchise at any time upon thirty days notice if Owner shall open or acquire, directly or indirectly, any interest in any other variety store except one operated under the Ben Franklin System with an underlying lease on the store building to the Distributor at Distributor's option, or if Owner shall move its operations under this franchise to any other physical location than that under which he commenced operation under this franchise."

through City Products, and will attempt to offer proof relating to those subclass members who have purchased signs or fixtures from sources other than the defendants.

### (4) Tying of Merchandise

The claim which plaintiffs desire to pursue on behalf of the subclass which includes virtually all members of the overall class as defined has for purposes of convenience been designated the "tying of retail merchandise" claim. Included in that broad claim are specific claims of conspiracy between City Products Corporation and its suppliers, the use of retail accounting to monitor store purchases, and various other methods of coercion directed at class members. There are a number of potentially serious legal and factual issues presented by the substantive merchandise tying claims which are asserted on behalf of the class,

not the least of which is the fact that the "tied item" or "product" is generally defined as "merchandise" and the fact that not all individual class members purchased all of the items of "merchandise" which were allegedly tied to the Ben Franklin trademark, service mark and franchise agreement. In their assertion that the numerous individual tying arrangements involving "merchandise" can be established through the use of evidence which is applicable to the class as a whole, plaintiffs indicate that their proof will consist primarily of various provisions of the standard Ben Franklin Franchise Agreement *"together with"* the "standard" procedures and policies of City Products Corporation in the sale and distribution of merchandise, including the relationships existing between City Products and its suppliers.[43] Although the Court deems it likely that the evidence indi-

---

**43.** Plaintiffs have indicated that they will rely extensively on paragraphs 1 and 2 of the standard Ben Franklin Franchise Agreement which provide:

"WHEREAS, Distributor is engaged in the business of distributing merchandise to merchants who own and operate retail variety stores, and out of its knowledge and experience gained through many years has developed a merchandising and store operating and service program, known as and designated <u>The Ben Franklin System</u>, which it offers to such stores as meet the standards required by Distributor; and

"WHEREAS, in connection with such merchandising and store operating and service program, Distributor is the owner of the mark "BEN FRANKLIN" registered in the United States Patent Office and under the laws of various states;

"WHEREAS, the Owner desires to avail himself of the aforesaid retail system in his store at _____ _____,
 (Street) (City)
_____ which system consists of a
 (State)
complete retail operating and promotional service and selected basic stock lists of merchandise for Ben Franklin Stores:

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter contained, the parties hereto agree as follows:

1 The Distributor agrees to furnish the Owner for use in his store the merchandising services outlined above known as

the Ben Franklin System of Variety type Retail Store Operation. The Owner agrees to receive such services and follow the practices prescribed thereby in the operation of his store as a Ben Franklin Variety type Retail Store to the best of his ability as long as this agreement shall remain in force.

2 Distributor agrees to furnish the Owner for use in his store basic stock lists of merchandise to be known as the merchandise check list and through supplemental and seasonal check lists to keep it adjusted to conditions, markets and consumer demand. Distributor will also supply general listings of other merchandise which may be desired by the Owner to supplement the basic stock merchandise to be carried by the Owner.

Distributor agrees that said lists at all times during the term of this agreement will be sufficiently complete in its judgment for the successful operation of a modern efficient Ben Franklin Retail Store as contemplated by this agreement. Prices, terms of payment and delivery shall be those quoted by the Distributor from time to time in accordance with its current practices to like stores and the credit standing of the Owner, as to which the Distributor shall be the sole judge.

Owner agrees to purchase merchandise of the type and quality offered by Distributor from time to time pursuant to the aforesaid Ben Franklin Retail System.

cated would in a class action be offered on behalf of the class to establish the existence of the alleged individual tying arrangements and to establish coercion and influence upon individual class members to purchase merchandise from City Products, it is unlikely that plaintiffs will limit their proof to the presentation of that evidence. Plaintiffs do not assert that the alleged tying arrangement will be established by proof of the terms of the franchise agreement alone. Rather they plan to adduce proof of the terms of the agreement and the application of other policies and procedures to class members. The evidence which was adduced during the proceeding on plaintiffs' class action request indicated that the most frequent personal contact which class members had with City Products Corporation was with the regional area and zone personnel. Furthermore, the distribution of merchandise by the Ben Franklin Division of City Products is conducted through the Regional Distribution Centers. The key area of proof which the Court deems likely to surface in the presentation of the claims and defenses of the parties on the merchandise tying claim is that which centers on the course of conduct which was followed by regional, area, and zone level employees of City Products in their relationship with class members concerning merchandise purchases. The evidence which relates to that course of conduct as it may bear on the merchandise tying claim is individual to each class member. It is likely that plaintiffs' class proof would include that evidence relating to individual class members, and it is even more likely that defendants will attempt to establish through evidence relating to a large number of individual class members that none of the class members believed themselves party to a tying arrangement or were required, coerced, "influenced" or pressured into buying any merchandise from or through City Products by employees of the Corporation. Plaintiffs' allegations of conspiracy do not dictate that these individual issues of fact will suddenly become irrelevant or disappear, as it is fundamental to plaintiffs' class claims that there was in fact a restraint of trade in

the form of an illegal tying arrangement which existed between the defendant City Products and each of the class members.

In attempting to determine the type of proof which defendants are likely to attempt to obtain and offer in defense of the merchandise tying claim, the Court has noted that plaintiff Charles R. Cruse while appearing as a witness in these proceedings stated on cross-examination by defendants' counsel that he did not claim that he had been "pressured" into buying merchandise from City Products. Furthermore, although plaintiffs seek to establish the existence of a tying arrangement with respect to merchandise for the entire period from April, 1968 through April, 1972, the evidence indicates that in March, 1970 a letter was sent by City Products Corporation to virtually all franchisees advising them that they were not required to buy any given amount of their merchandise from the Ben Franklin Division of City Products. It is thus likely that the defendants will attempt to establish by individual class member testimony that individual franchisees subsequent to that date were not subject to any merchandise tying arrangement and were not pressured, influenced or coerced by City Products Corporation to purchase merchandise from or through the Ben Franklin Distribution Centers.

### c. *Injury and Damages*

Due to the fact that the tying claims asserted by plaintiffs on behalf of the various subclasses involve claims which if established constitute *per se* violations of the Sherman Act, thus obviating the necessity of a showing of unreasonable anticompetitive effect, it is clear that plaintiffs will not be faced with individual issues in that regard. See *Fortner Enterprises v. United States Steel Corp., supra.* However, as previously indicated, the question of the amount of monetary damages suffered by the individual class members remains an issue which must also be scrutinized in the context of the Rule 23(b)(3) requirements. The Court has indicated its findings with regard to the feasibility of proof of dam-

ages on each of the tying claims through evidence applicable to the class as a whole. However, those observations were applicable only to proof of damages and did not touch upon the likelihood of individual proof which may be offered by the defendants to attempt to negate damages. It appears likely that if the proceedings on the trial of the substantive issues in this cause would reach the stage for presentation of proof of damages and defendants' evidence in opposition to that proof, the defendant would at a minimum seek to establish the inaccuracy of plaintiffs' statistical methods of proof by evidence relating to the circumstances of at least some individual class members. Moreover, there is nothing to indicate that the defendants are or will be willing to merely attack the accuracy of plaintiffs' proposed methods by proof of an individual nature, and it is likely that should plaintiffs present their statistical computations of the measure of damages the defendants will also seek to enter the battle of the statistical experts and offer their own "more accurate" methods to establish that in fact the class members suffered no damages or "negative damages". There is, particularly with regard to plaintiffs' proposed method of proof of damages on the merchandise tying claims, an enormous potential for the introduction of evidence relating to the mix of merchandise purchased by individual class members and the price at which comparable merchandise could have been obtained from third parties.

### 3. Questions of Law and Fact Presented by the Confidential Rebates Claim

The claim designated by plaintiffs as the "confidential rebates" claim is premised by plaintiffs as a restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and as an illegal "brokerage fee" under Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c). Although plaintiffs' arguments offered in support of the maintenance of this claim on behalf of the class members occasionally venture into the area of attempting to proceed with a claim for breach of contract or common law fraud,

the Court will consider in its Rule 23 determinations these claims as brought only under the antitrust laws of the United States.

Viewed merely as a claim that the defendant City Products violated some fiduciary duty owed to each of the individual class members by the terms of the standard Ben Franklin Franchise Agreement, the Court deems such a claim inappropriate for class action certification. Aside from the problems presented by the contention that a claim for breach of fiduciary duty is "pendent" to the federal antitrust claims for purposes of federal jurisdiction, plaintiffs ignore and oversimplify the dilemma presented by the application of the choice of law principles in the context of this case. Assuming *arguendo* that this Court would apply the choice of law principles of the State of Missouri, which may or may not be that which would be applied if the class member would bring his individual action, the decisions of this Court indicate that the Missouri choice of law principles do not strictly adhere to the *"lex loci contractus"* rule or merely look to the "state in which the contract was made". *Moss v. National Life and Accident Insurance Company*, 385 F.Supp. 1291 (W.D.Mo.1974); *Nelson v. Aetna Life Insurance Co.*, 359 F.Supp. 271 (W.D.Mo.1973). Rather, each contract or franchise agreement would require analysis under the approach advocated by the *Restatement (Second) Conflicts of Law* to determine the state law applicable thereto. Obviously, this determination will not result in the application of the law of any one state to the claims or to these contracts for franchised stores located in 48 states, the District of Columbia, and Guam. Therefore, it is concluded that a class action for breach of fiduciary duty would not present questions of law common to the class and would in fact involve the application of the law of virtually every state in the Union to the language of the standard Ben Franklin Franchise Agreement to determine the extent of the alleged fiduciary duty, if any, owed to each class member and the question of possible breach. It is the conclusion of the Court, in the context of this case, claims

for breach of a fiduciary duty founded in contract are not appropriate for presentation on behalf of the class herein proposed under Rule 23(b)(3). The individual questions of law would in such presentation clearly outweigh any common questions of law or fact which might be involved, and the litigation of the individual claims for breach of fiduciary duty would be in practical terms hindered by the certification of a class action.[44]

As claims for violation of the federal antitrust laws, the "confidential rebate" claims brought by plaintiffs on behalf of virtually all members of their defined class do present some questions of law and fact common to the members of the class. Although the Court does not clearly understand plaintiffs' contention that the alleged presence of confidential rebates granted by suppliers to City Products Corporation constitutes price discrimination which has caused competitive injury to plaintiffs and class members who purchased merchandise from City Products Corporation, the Court deems that this ultimate question of law and fact is one which is common to the proposed class of plaintiffs in the sense that the evidence and legal considerations relevant thereto are likely to be applicable to the entire class. Additionally, the question of whether the rebates paid from suppliers to City Products Corporation constitute

"sham brokerage" fees or some other form of payment illegal under Section 2 of the Robinson-Patman Act or Section 1 of the Sherman Act is a question common to the class. As previously indicated, those claims for damages on the rebate claims for the period 1960 through 1967 which have been deemed abandoned by the Court present the individual issue of fraudulent concealment and involve individual determinations of the amount of damages which would involve evidence relating to the individual class members.

Assuming *arguendo* that the "*confidential rebate*" claim asserted by plaintiffs can be established to constitute a violation of either Section 2 of the Robinson-Patman Act or Section 1 of the Sherman Act, the primary individual issues of fact which are likely to arise are those of competitive injury and the amount of the total damages allocable to the individual class members. Considering the nature of the claim and plaintiffs' proposed method of proof of damages it is the opinion of the Court that for the period 1968–1972 the evidence relating to these individual issues is likely to be of the type which is applicable to the class as a whole, and the Court deems it unlikely that the plaintiffs or defendants will offer evidence relating to only an individual class member in the presentation or defense of this claim.[45]

**44.** Other individual questions of law involving the applicable statute of limitations, and the appropriate measure of damages, would necessarily arise in the presentation of the claims of each class member. The presence of these multiple individual questions of state law in litigation in a United States District Court clearly defeats any initial economies which might be present in the presentation of the claims under Rule 23, F.R.Civ.P., and compels the finding that with regard to these claims the class action device is not superior to other available methods for the fair and efficient adjudication of the individual claims of breach of fiduciary duty.

**45.** The defendants have indicated that with regard to plaintiffs' claims for damages under the confidential rebate claim that their primary concern would be with challenging the viability of the claim on a legal basis and attempting to show the inaccuracy of the proposed method for proof and allocation of damages. In view

of the substantive principle that Section 2(c) of the Robinson-Patman Act prohibits affiliated and unaffiliated purchasing organizations from receiving commissions from sellers and passing those commissions on to subscribing buyers for whom the organization acts as purchasing agents, the Court deems it likely that the primary defense presented will be that plaintiffs' claims of "confidential rebates" do not as a matter of law entitle the class members to monetary damages. See 9 Von Kalinowski, *Antitrust Laws and Trade Regulation*, § 68.-06(3) (1972 ed.). Secondarily, it is anticipated that the defendants will attempt to establish the inaccuracy of the plaintiffs' method of proof of damages by a showing that variables necessary to an accurate computation of damages were not considered in plaintiffs' method. Neither of these defenses appear likely to involve proof of facts relating only to individual class members.

Insofar as the class claims for injunctive relief on the "confidential rebate" claim, for the same reasons as stated in connection with the damage claims, the Court deems it unlikely that individual issues of fact will arise with respect to those claims in the presentation of plaintiffs' evidence. It is anticipated that the defenses presented by the defendants, although somewhat related to the individual status of the class members, will be presented through evidence applicable to the class as a whole, and that the primary defense to these claims for injunctive relief will relate to the competitive level of the class members in the market and their standing to bring suit for injunctive relief from the alleged violations of the antitrust laws embodied in plaintiffs' "confidential rebate" claims. See, e. g. *Karlinsky v. New York Racing Ass'n, Inc.,* 310 F.Supp. 937 (S.D.N.Y.1970); *Willard Dairy Corp. v. National Dairy Products Corp.,* 309 F.2d 943 (6th Cir. 1962). Possibly, defendants may attempt to establish by evidence pertaining to individual transactions between City Products and its suppliers some justification for any rebate allowances or discounts it may have received. See 15 U.S.C. § 13(a).

### 4. *Questions of Law and Fact Presented by the Price Discrimination Claims*

■ Because the Court has previously determined that the "price discrimination" claims sought to be presented on behalf of the proposed subclass of plaintiffs are not appropriate for class certification due to a lack of numerosity in the subclass, the Court will not go into detail with regard to the outlining of the common and individual issues of law and fact. Nevertheless, the Court has concluded that assuming *arguendo* that the subclass membership could meet the numerosity requirement of Rule 23(a), these claims would be inappropriate for class action presentation for failure to meet the predominance requirement of Rule 23(b)(3). Although plaintiffs' "price discrimination" claims do present some common questions of law and fact, particularly in the areas of whether or not the alleged violations involved the requisite nexus with

interstate commerce, the "same seller", "different purchasers", and "commodities" within the meaning of Section 2(a) of the Robinson-Patman Act, a large number of individual issues are presented. Included in the issues which are individual to the class members and are not likely to be susceptible to proof by evidence applicable to the class as a whole are the following: (1) the items of merchandise which were purchased by class members contemporaneously with allegedly favored stores; (2) whether the allegedly discriminatory sales involved commodities of "like grade and quantity" within the meaning of Section 2(a); (3) whether a class member's store "competed" with an allegedly favored store; (4) whether the class member suffered competitive injury as a result of the alleged price discrimination; and (5) whether price differentials can be justified by differences in costs of sale, delivery, quantities, changing conditions in the particular market, or services provided to purchasers.

■ Because the essential jurisdictional and substantive elements of a claim of secondary level price discrimination in violation of Section 2(a) of the Robinson-Patman Act inherently involves individual issues of fact which constitute a major portion of plaintiffs' required proof, those claims are rarely suitable for class action certification under Rule 23(b)(3). See *Bel Air Markets v. Foremost Dairies,* 55 F.R.D. 538 (N.D.Cal. 1972). Where, as is the situation in the instant litigation, the geographic markets in which the injury to competition has allegedly occurred are ones which are essentially local in nature, and where the discrimination is alleged to have occurred in the pricing of in excess of 10,000 separate items of "merchandise" of various types and sizes, this Court is of the opinion that the class action device would merely operate to concentrate a number of individual actions in the same forum. Therefore, with regard to plaintiffs' motion to proceed on behalf of the proposed class and subclass with their claims for price discrimination between class members' stores and allegedly favored stores, the Court finds that common issues

of law and fact do not predominate and that the class action device is not superior to other available methods for adjudication of the controversy.

5. *Questions of Law and Fact Presented by the "Encroachment" or "Monopolization" Claims*

Plaintiffs' asserted class claims designated by them as "monopolization claims" at some times, and as "encroachment claims" at other times, seek pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, an order enjoining those practices which they claim constitute a combination and conspiracy to monopolize in violation of Sections 1 and 2 of the Sherman Act and an attempt to monopolize in violation of Section 2 of the Sherman Act. Although plaintiffs have, in effect, treated Sections 1 and 2 of the Sherman Act as coextensive, and have not specifically approached their claims as two separate claims of violations of the federal antitrust laws, the Court will in recognition of the distinction between an "attempt to monopolize" and a "conspiracy to monopolize", discuss the claims separately. As has previously been discussed in connection with plaintiffs' request to proceed with these claims as a class action under subsection (b)(2) of Rule 23, Section 16 of the Clayton Act does not place the private litigant in the position of an enforcer of public rights, and in order to obtain injunctive relief under that statute, the litigant must demonstrate threatened injury of a personal nature proximately resulting from the alleged anticompetitive actions.[46]

With these basic principles in mind it becomes apparent that plaintiffs' claims for injunctive relief from the alleged attempts to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, present numerous individual issues of fact. An "attempt to monopolize" within the meaning of Section 2 of the Sherman Act is generally defined as "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, neverthe-

less approach so close as to create a dangerous probability of it." See 2 Von Kalinowski, *Antitrust Laws and Trade Regulation,* § 9.01(1), p. 9–4 (1972 ed.); *Kansas City Star Company v. United States,* 240 F.2d 643 (8th Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). The Eighth Circuit Court of Appeals has not removed the requirement of a "dangerous probability" of monopolization encompassed by claims of attempts to monopolize under Section 2 of the Sherman Act. Therefore, plaintiffs' class claims under Section 2 of the Sherman Act necessarily involve a definition of a product market and proof of a geographic market.

In the context of the claims asserted on behalf of the class herein, the Court deems it likely that the issues of "intent" and the relevant "product" market involved in the attempt to monopolize claims are issues which will be determined primarily by evidence which is common to the class which plaintiffs seek to represent. However, the Court deems it likely that the issues of "sufficient market control" and of "geographic market" will be determined by evidence relating to the individual markets and individual class members. Therefore, the ultimate issue of whether there exists a "dangerous probability of monopolization" with respect to any class member is an issue which will have to be determined on an individual basis, considering each geographic market.

Due to the fact that the elements of proof encompassed by plaintiffs' class claim that the defendants have combined and conspired to monopolize trade and commerce in violation of Section 1 and 2 of the Sherman Act differ substantially from those elements involved in their claims of an "attempt to monopolize" in violation of Section 2, the individual issues previously discussed in connection with the "attempt" claims are not all present in the combination and conspiracy claims. The most notable difference is that the combination and conspiracy claims do not involve proof of a dangerous probability of monopolization.

**46.** See pages 156–157, *supra.*

However, "monopolization" does not appear in a vacuum, and therefore, the issues of "product market" and to some degree "geographic market" are likely to arise in the presentation of and defenses to the claims.[47] As with the attempt to monopolize claim, the Court deems it likely that the issue of product market will be determined from evidence which is common to the class members, and that the issues of "combination or conspiracy", "overt acts", intent, and the amount of interstate commerce affected are common to the class. However, as with the attempt to monopolize claim, the Court deems it unlikely that the element of relevant "geographic market" can be established as to each class member without the presentation of some evidence pertaining to those individual markets in which the class members are located. Plaintiffs herein concede that the geographic market involved in their conspiracy to monopolize claims are local markets, and in fact by their allegations that the conspiracy to monopolize is directed to "small" stores operated by franchisees imply that a determination will be required as to the size of each class member's store and the geographic market in which it is located. It is the preliminary opinion of the Court that although these two questions are individual to each class member it is likely that they can be determined from evidence which is applicable to the class as a whole.[48]

### 6. Questions of Law and Fact Presented by the Exclusive Dealing Claim

It is the opinion of the Court that plaintiffs' primary proof in connection with the claim designated the "exclusive dealing" claim will consist of paragraph 11(c) of the standard Ben Franklin Franchise Agreement and the policies of City Products Corporation with respect to the enforcement of that clause.[49]

Because only injunctive relief is requested on this claim, the Court deems it unlikely that plaintiffs will attempt to establish through evidence pertaining to individual class members actual instances of enforcement of that clause, but will rely upon the facial content of the clause and the standard procedures and policies of City Products to establish a threat of injury to class members as required by Section 16 of the Clayton Act. Thus in plaintiffs' proof the Court does not anticipate the presentation of evidence pertaining to only individual class members.

It is further the opinion of the Court that the defenses which may be presented in

---

47. The question of whether or not the issue of relevant market is one involved in a civil action alleging a combination and conspiracy to monopolize in violation of Section 1 and 2 of the Sherman Act is one which is not well settled. See 1 Von Kalinowski, *Antitrust Laws and Trade Regulation*, § 7.01(1), p. 7–16, n. 41 (1972 ed.). It is the opinion of the Court that although the showing of relevant geographic market may not be as specific as that required in cases charging attempts to monopolize or actual monopolization, some definition of the relevant product market and geographic market is necessary for a private party to obtain injunctive relief under Section 16 of the Clayton Act, as the prerequisite to the obtaining of such relief is a showing of threatened injury of a personal nature. Unless there is some showing of the product and geographic market involved in the conspiracy to monopolize and the product and geographic market occupied by the plaintiff, it is extremely unlikely that the plaintiff can show that which is required to obtain injunctive relief under Section 16 of the Clayton Act.

48. This conclusion is based primarily on the fact that although some proof of geographic markets will be required, it is not anticipated that plaintiffs will attempt to adduce evidence with respect to specific activities within each market, but rather will attempt to establish that the object of the alleged combination and conspiracy is to monopolize the "variety store industry" by the replacement of "small" franchised stores with "company owned" stores in *all* of the local geographic markets involved, thus obviating the necessity of showing an intent to monopolize any specific local market in order to establish a threat of injury to individual class members. In that context, specific delineation of the boundaries of local geographic markets would not appear necessary to plaintiffs' proof or likely to be presented by defendants in their defense of the claim.

49. Paragraph 11(c) of the standard franchise agreement has previously been quoted in connection with the analysis of the "tying of premises" claim. See p. 166 *supra*.

opposition to this claim will not likely involve evidence pertaining to the individual class members. Defendants' contentions pertaining to the "exclusive dealing" claim appear to be that because City Products has by letter to all current franchisees purported to delete that portion of paragraph 11(c) which is the subject of plaintiffs' claim, the claims for injunctive relief are moot and no present threat of injury to any class member, or any present restriction on the activities of class members can be established. In view of the limitation of the claim to a request for injunctive relief on behalf of the class, the Court deems it unlikely that the defendants will attempt to obtain or adduce proof of the effect of the alleged illegal practice on the individual class members, or that they will attempt to establish that the individual class members suffered no injury as a proximate result thereof.

### 3. Predominance and Superiority Under Rule 23(b)(3)

In view of the evidence presented, findings and conclusions outlined in the previous sections of this Memorandum, the Court has reached the conclusions set forth hereinafter with respect to plaintiffs' motion to proceed with their proposed class action under the provisions of Rule 23(b)(3), F.R. Civ.P. In reaching these conclusions the Court has assumed that any class action which might be certified will proceed to trial and in that trial the plaintiffs will attempt to establish the class claims and defendants will attempt to defeat them by any and all evidence which they can obtain favorable to their respective positions. It is the conviction of the Court, in view of the substantial evidence which has been adduced, a class action, which at this time appears to be improper, should not be conditionally certified for such certification will not benefit the class representatives, the class members, the defendants, or the judicial system, and in fact may substantially impair the interests of the absent class members.

Because the Court has previously indicated its conclusions regarding the "price discrimination" claims, those conclusions will not be set forth in this section.

### a. The Tying Claims

 It is the finding and conclusion of the Court that the questions of law and fact common to the members of the class in each of plaintiffs' tying claims do not predominate over questions affecting only individual members of the class and that the class action proposed is not superior to other available methods for the fair and efficient adjudication of those claims.

 With respect to each of the tying claims, except the tying of accounting claim, the initial problem which plaintiffs have failed to overcome in this case is that which in normal circumstances defeats a motion to maintain a Rule 23(b)(3) class action on behalf of a large number of persons who allegedly have been subjected to an illegal tying arrangement by a single defendant. The fundamental issue in the proof of an illegal tying arrangement is the proof of the arrangement itself. Whether the question is stated to be one of "coercion", "influence", "persuasion" or of the "fact of existence of the arrangement", the presence of the issue has the same impact. That impact is a necessity of proof of matters which have occurred between each of the class members and the defendant. Matters of proof on behalf of the class and evidence adduced on behalf of the defense will necessarily relate to the matters which took place between each of the class members and the defendant accused of imposing an illegal tying arrangement upon them. Unless the class proof of the time arrangement is to be made entirely by the introduction of evidence which pertains to the entire class, as for example, when the *only* evidence of the tying arrangement or agreement consists of the terms of a standard written document which has been entered into between each of the class members and the defendants, the presence of the individual issues will in most circumstances defeat the motion to proceed under Rule 23. Furthermore, in examining a motion to proceed on behalf of a large class of persons with

civil antitrust claims the Court is required to do more than consider that which may be theoretically possible to establish a *prima facia* case on behalf of the class, it is required to consider the issues of law and fact which are likely to arise in the litigation of the claim, including those which are likely to arise by reason of the defenses presented.

In the instant cause, in the context of the four separate claims of illegal tying arrangements which are claimed to have been imposed on various members of the overall class during a period commencing in 1968 and continuing through the time of trial, and in view of the terms of the written franchise agreements, it is unreasonable to assume that if a class action were certified plaintiffs' class proof on the existence of all of the tying arrangements would be limited to the written agreements or other evidence which is applicable to the class as a whole. Except as to the existence of the tying arrangement concerning accounting services, in all reasonable probability, the plaintiffs and defendants would seek to obtain information relating to the existence of the alleged tying arrangement from each individual class member and seek to adduce evidence relating to those individuals in the trial of the class claims. At that point those issues which the Court has indicated it deems common to the class or determinable by common evidence would simply be overwhelmed by the evidence relating to the question of whether each individual class member was party to a tying arrangement.

In addition to the conclusion of the Court that the individual factual issues relating to the existence of the alleged tying arrangements on all claims but the alleged tying of accounting claim would not be predominated by the common questions of law or fact, it is the conclusion of the Court that on the majority of plaintiffs' tying claims, including the tying of accounting claim, the evidence relating to the amount of damage, if any, incurred by the class members would involve proof relating to the individual class members. Assuming

*arguendo* the possibility of severance of these damage issues from those involved in proof of liability and competitive injury, the Court would still be faced with in excess of 1000 separate proceedings for damage determinations. This possibility, coupled with the extreme likelihood of the presence of individual proof on the issues of liability previously mentioned convinces the Court that the class action as proposed is not superior to other available methods of adjudication of the tying claims within the meaning of Rule 23. Notably, on the tying of accounting claim, the records of the defendant City Products do not disclose the identity of all of those franchisees who subscribed to the accounting service during the years 1968 through 1972 and do not disclose the amount the individual franchisees paid for accounting service during the years 1968 through 1970, thus making likely the necessity of discovery from and possibly the appearance at trial of each individual member of the subclass of approximately 900 or more franchisees presenting this claim. Furthermore, the evidence adduced at the hearing of plaintiffs' motion brought into serious question plaintiffs' allegation that during the period 1968 through 1972 there existed a comparable accounting service available on a nationwide basis. Although the Court makes no finding on the question of whether or not such services were in fact available, it does note that there is serious question involving the availability of such a service on a nationwide basis. Should a class action involving the previously discussed individual questions of fact be certified and it develop that the nationwide service was not available or not comparable to the City Products service, plaintiffs' proof of damages on the tying of accounting claim would involve proof of the cost of a comparable service on a local basis, thus substantially increasing the amount of evidence pertaining to only an individual class member's damages.

The presence of the individual questions of proof on the issue of the identity of the class members who subscribed to the accounting service, coupled with the necessity of individual proof on the amount paid

for the service and the possibility of individual proof on the amount which would have been paid for a comparable service, convinces the Court that the accounting tying claim if certified as a class action would not be superior to other available methods of adjudication of the controversy by reason of its unmanageability. See *In Re Transit Tire Antitrust Litigation, supra.*

Rule 23(b)(3) does not require a total absence of individual questions before a class action may be maintained. However, when the individual issues of fact which are presented by the claims are substantial in the sense that a large volume of evidence may be relevant to their proof, and when it is not probable that the issues can be determined from evidence which is applicable to the class as a whole, class certification under that subsection of the Rule becomes questionable. When, as in this case with the tying claims, the class membership consists of in excess of 1000 individuals located throughout the United States, the presentation of the claims and defenses of the parties will likely involve the presentation of a large amount of evidence relating to each of those individuals and their individual relation with the defendant in numerous respects, and substantial claims for treble damages are involved, class certification is in the opinion of the Court inappropriate.

### b. *The Confidential Rebates Claim*

It is the finding and conclusion of the Court that the common questions of law and fact presented by the class antitrust claims designated the "confidential rebate" claims for the period 1968 through 1972 predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy presented by these claims.

In reaching this conclusion the Court has as previously indicated viewed these class claims as limited to claimed violations of the federal antitrust statutes. In that context the Court finds that the issues presented are primarily questions of law which are common to the class as defined. Should the plaintiffs be successful in overcoming the legal defenses which are likely to be asserted by the defendants, it is the opinion of the Court that the evidence which plaintiffs and defendants will be likely to adduce on the class claims will be of the nature that relates to the class as a whole. Without expressing an opinion as to the legal sufficiency of plaintiffs' proposed method of proof of damages and method of allocation of any recovery to the class members, the Court has concluded that the method can be applied through the use of data obtained from the defendants, and that utilizing the method, severance of proof of damages and the appearance of individual class members for damage proof will not be required.

The Court does not at this time find that those matters listed in Rule 23(b)(3) subsections (A) through (D), or other matters dictate that a class action is not superior to other available methods of adjudication of the controversy presented by this claim.

### c. *The Encroachment or Monopolization Claims*

It is the finding and conclusion of the Court that plaintiffs' claim on behalf of the defined class that the defendants have engaged in an "attempt to monopolize" in violation of Section 2 of the Sherman Act does not present questions of law or fact common to the class which predominate over questions affecting only individual class members.

The "attempt to monopolize" claim presented on behalf of the class involves the individual questions of "market position", "geographic market", and "a dangerous probability of monopoly". Those questions of fact would in the event a class action were declared, necessarily involve proof relating to each locality in which a class member's store and a "company-owned" store existed contemporaneously. Plaintiffs have not with respect to this claim limited their subclass membership to persons whose stores may be shown to be in a "trade area" of a "company-owned" store by surveys prepared by the defendants. The individual

questions of "geographic markets" presented by these claims are not likely to be subject to proof by evidence relating to the class or subclass as a whole. The Court deems these individual questions to be of the type which would likely involve the testimony of each of the individual members of the subclass on behalf of which the claims are presented, and which would likely involve detailed evidence relating to market conditions in a number of local areas scattered throughout the United States. In this context, the Court is of the opinion that these individual issues are not predominated by the common issues of law or fact presented by the class claim, and that the class action device is not a superior method of adjudication.

 The Court has, however, concluded that the class claim that the defendants have combined and conspired to monopolize trade or commerce in violation of Sections 1 and 2 of the Sherman Act does present common questions of law and fact which predominate over any questions affecting only individual members, and that as an action for injunctive relief the proposed class action is superior to other available methods of adjudication of the controversy. The Court has previously indicated the questions which might arise to affect only individual class members and its conclusion that these issues are likely to be determined by evidence which relates to the class as a whole. The problem which the Court discussed in connection with plaintiffs' motion to proceed with this claim under subsection (b)(2) of Rule 23; namely, that involving a determination of which members of the proposed subclass are claimed to have been threatened with injury by these alleged illegal practices and thus possibly entitled to injunctive relief, does not dictate against class certification under Rule 23(b)(3) in the context of this case, as it is likely that plaintiffs will be able to adduce common evidence showing precisely those individual class members who are claimed to be the object of the alleged combination and conspiracy.

#### d. *The Exclusive Dealing Claim*

 It is the finding and conclusion of the Court that the class claim designated the "exclusive dealing" claim does present questions of law and fact common to the members of the class which predominate over any questions affecting only individual class members, and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy presented by this class claim.

 The Court has also indicated previously that the requirements of Rule 23(a)(2) have been satisfied in connection with this claim and that with that prerequisite satisfied the claim designated as the "exclusive dealing" claim is appropriate for maintenance as a class action under the provisions of Rule 23(b)(2). However, because several of the claims herein have been found appropriate for class action presentation under the provisions of Rule 23(b)(3) and therefore the notice required by Rule 23(c) will be provided as to those claims, the Court deems it more appropriate that the "exclusive dealing" claim be presented under a Rule 23(b)(3) class action and included in the notice to class members. The Court deems it in the best interest of the class members that this claim proceed under Rule 23(b)(3) as opposed to Rule 23(b)(2) and therefore plaintiffs' motion to proceed with a Rule 23(b)(2) class action with these claims will be denied.

### IV. CONCLUSIONS AND ORDER

 Because the Court is of the opinion that the primary focus of plaintiffs' proposed class action is the recovery of damages on behalf of themselves and the proposed class members, some doubt exists as to whether those plaintiffs which the Court has determined to be adequate class representatives will desire to proceed on behalf of their proposed class with the claims which have been determined appropriate for maintenance as a class action under Rule 23(b)(3). Notably, the Court has determined that only six of the original eleven plaintiffs will adequately represent the class members, and that only one of the

claims for damages is appropriate for class action certification. In view of these developments, those six plaintiffs may not wish to carry the financial burden and responsibility which they will take on in proceeding with the claims which have been determined appropriate for class certification. Moreover, the plaintiffs in this action presently have pending their individual claims for substantial damages allegedly caused by the defendants' violations of the federal antitrust laws which they obviously desire to present on behalf of themselves. In order to permit the plaintiffs to confer among themselves and with their counsel as to the appropriate course of action in view of the outcome of their class action request, the Court will not at this time issue its order certifying a class action on those claims which have been found appropriate for class action presentation. Further, the Court will not at this time designate those plaintiffs which are to represent the subclasses on behalf of which these claims are to be presented, as it is possible that one or more of the plaintiffs whom the Court has determined to be appropriate subclass representatives will not desire to act as class representative on the claims which are to be presented on behalf of the class and various subclasses. Therefore, counsel for plaintiffs will be directed to advise the Court as to plaintiffs' desires in view of the outcome of their class action request prior to the Court's Order certifying claims for class action presentation.

The Court is acutely aware of the extensive amount of effort which has been devoted to both the presentation of the motion to proceed on behalf of the class and the defense of that motion. The resolution of the overall controversy and of the specific subcontroversies has been rendered extremely difficult by the fact that plaintiffs have sought to present numerous claims on behalf of a large number of individuals. The only truly common elements which can be seen when this litigation is viewed as a whole are that all plaintiffs and proposed class members at some time have operated a retail store under the Ben Franklin franchise system and all are claimed to have some sort of private antitrust claims which arose out of that relation with the defendant City Products Corporation. The Court has attempted to determine as appropriate for class action maintenance only those claims which truly meet the requirements of Rule 23, mindful that the combination of the right of private action under federal antitrust laws and Rule 23 of the Federal Rules of Civil Procedure does not operate to place individuals in the position of the government in the field of trade regulation but does within the confines of the judicial system contribute to the enforcement of the federal antitrust laws to the benefit of the public.

The observation of this Court in its decision in *In Re Transit Tire Antitrust Litigation*, 67 F.R.D. 59, at 81, applies equally to the claims brought by plaintiffs in this case on behalf of their proposed nationwide class which have been determined to be inappropriate for class action presentation. That is:

"The Court is not unmindful of the judicial economy which can be gained by the proper application of Rule 23 of the Federal Rules of Civil Procedure. However, the application of Rule 23 to this litigation without regard to the numerous individual issues of fact which are likely to arise, and without regard to the tremendous administrative and management problems which will inevitably arise is not in the interests of judicial economy or in the interests of justice. A declaration of the class action requested by plaintiffs would not result in the fair and efficient adjudication of the controversy so far as the individual class members are concerned, but instead would bury their potential cause of action under the weight of evidence pertaining to the claims of other class members."

On the other hand those claims herein determined to be appropriate for class action presentation shall receive the attention of this Court and be processed to a speedy adjudication of the controversy.

Accordingly, for the reasons stated it is hereby ORDERED:

(1) That the motion and request of the plaintiffs herein to proceed under Rule 23, F.R.Civ.P., with the claims in this action designated as "price discrimination", "tying of accounting services", "tying of fixtures and signs", "tying of store premises" and "tying of merchandise" are hereby denied.

(2) That the motion and request of the plaintiffs herein to proceed under Rule 23, F.R.Civ.P., with the claims in this action designated as the "attempt to monopolize" in violation of Section 2 of the Sherman Act is hereby denied.

(3) That the motions and requests of the plaintiffs to proceed under Rule 23(b)(1) or Rule 23(b)(2), F.R.Civ.P., with any and all claims in this action are hereby denied.

(4) That the motion and request of the plaintiffs to proceed under Rule 23, F.R. Civ.P., with the claims designated as the "confidential rebate claims" for damages incurred at any time prior to April 7, 1968, is hereby denied.

(5) That the motion and request of plaintiffs Cruse, Williams, Sites, Augusta Variety, Inc., Chmieleski, and D. M. & D., Inc., to proceed under Rule 23(b)(3), F.R.Civ.P., with the claim designated as the "confidential rebate" claim for damages for the period April 7, 1968 through April 7, 1972, and the motion of plaintiffs Cruse, Williams, Sites, Augusta Variety, Inc., to proceed with those claims for injunctive relief on behalf of the subclass of persons as defined be conditionally granted upon notification by counsel for plaintiffs that those plaintiffs desire to proceed with the requested action.

(6) That the motion and request of plaintiffs Cruse, Williams, Sites, and Augusta Variety, Inc., to proceed under Rule 23(b)(3), F.R.Civ.P., with the claim designated the "combination and conspiracy to monopolize" claim for injunctive relief on behalf of the subclass as defined be conditionally granted upon notification by counsel for plaintiffs that those plaintiffs desire to proceed with the requested class action.

(7) That the motion and request of plaintiffs Cruse, Williams, Sites, and Augusta Variety, Inc., to proceed under Rule 23(b)(3), F.R.Civ.P., with the subclaim designated the "exclusive dealing" claim for injunctive relief on behalf of the subclass as defined be conditionally granted upon notification by counsel for plaintiffs that those plaintiffs desire to proceed with the requested action.

(8) That in all other respects the motion of the plaintiffs to proceed under Rule 23, F.R.Civ.P., with any claims in this action on behalf of any class of persons is hereby denied.

(9) Plaintiffs' counsel shall within 20 days from the date hereof advise the Court in writing of the desires of his clients regarding the herein conditionally certified class actions.

IT IS SO ORDERED.[50]

---

**50.** Just prior to the completion of this opinion, plaintiffs Albert M. and Miriam Schwartz and defendants entered into a settlement agreement. By its Order entered on March 31, 1976, this Court approved that settlement agreement, dismissed with prejudice plaintiffs' Schwartzs' individual claims against defendants, and dropped plaintiffs Schwartz as parties from this action.